## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

—————————————————————————

| | |
|---|---|
| STEVEN W. YOUNG and LATRICE ROBINSON | ) ) ) ) |
| Plaintiffs, | ) Docket No. 3:19-CV-00886-JWD-SDJ |
| v. | ) ) |
| CITY OF BATON ROUGE, CHIEF THOMAS MORSE, JR., DOE OFFICERS 1-20, ABC INSURANCE COMPANIES 1-10 | ) ) ) ) |
| Defendants. | ) ) |

—————————————————————————

### AMENDED COMPLAINT FOR DAMAGES

NOW INTO COURT, through undersigned counsel, comes Plaintiff Steven Young who files the following Amended Petition for Damages.[1]

### I.    INTRODUCTION

1.    On October 24, 2018, two members of the Baton Rouge Police Department Street Crimes Unit tackled Steven Young without provocation and beat him until he was unconscious.

2.    BRPD then transported Mr. Young to the "BRAVE Cave," a now-notorious law enforcement black site where he was subjected to a visual cavity search and additional violence.

3.    Mr. Young originally brought this suit in 2019 to enforce his rights and seek accountability for that incident.

---

[1] Plaintiff Latrice Robinson remains a plaintiff in this matter, but with separate counsel. Her facts are outlined in the original complaint and incorporated into this Amended Complaint for consistency, although this pleading is only for Plaintiff Young.

4.      But then, on August 4, 2023, while this lawsuit was still pending, Mr. Young was again physically assaulted by BRPD officers, including being subjected to a TASER while handcuffed and cooperating while officers yelled "I'm going to fucking beat the fuck out of you."

5.      That incident and the aftermath was captured on the officers' body-worn cameras.

6.      After Mr. Young identified himself and that there was a pending lawsuit, one officer is heard on video laughing while stating "I know who you are" before cutting the audio on his body-worn camera.

7.      Officers then transported Mr. Young back to the BRAVE Cave where he was visual cavity searched again.

8.      Accordingly, Steven Young files this Amended Complaint.

## II.      JURISDICTION AND VENUE

9.      Plaintiff's claims arise under the Constitution and the law of the United States. This Court has original jurisdiction over Plaintiff's claims of federal rights violations pursuant to 28 U.S.C. §§ 1331. This Court has supplemental jurisdiction over Plaintiff's Louisiana state law claims in accordance with 28 U.S.C. § 1367.

10.     The venue is proper in the Middle District of Louisiana under 28 U.S.C. § 1391. Defendants are located in the Middle District of Louisiana and a substantial part of the events giving rise to the claim occurred in East Baton Rouge Parish, situated in the Middle District of Louisiana.

### III.     PARTIES

*Plaintiffs*

11.     Plaintiff **Steven W. Young** is a person of the full age of majority domiciled in East Baton Rouge Parish, Louisiana. He is represented by undersigned counsel.

12.     Plaintiff **Latrice Robinson** is a person of the full age of majority domiciled in East Baton Rouge Parish, Louisiana. She is represented by separate counsel.

*Defendants*

13.     Defendant **City of Baton Rouge** is a governmental subdivision.

14.     Defendant **Chief Thomas Morse, Jr**. is a person of the full age of majority currently serving as chief of police for the Baton Rouge Police Department. He is sued in his official capacity.

15.     Defendants **Doe Officers 1-20** are not-yet-identified officers of the Baton Rouge Police Department or other law enforcement agencies who may be identified through this litigation. Doe Officers include, but are not limited to, the following unknown individuals from body camera footage:













16.    Defendants **ABC Insurance Companies 1-10** are not-yet-identified insurance companies that hold policies which cover any or all of the co-Defendants for the actions alleged herein.

## IV.    PROCEDURAL HISTORY

17.    Plaintiff originally filed this case on October 24, 2019, in the 19th Judicial District Court for the Parish of East Baton Rouge.

18.    The case was subsequently removed to federal court.

19.    Defendants then filed a motion to stay these proceedings because "[a] criminal proceeding has been initiated against Young and Robinson surrounding the [2018] arrest."[2]

20.    Defendants' motion was granted and the suit was stayed on February 13, 2020, "pending the resolution of the related criminal proceeding."[3]

21.    No steps have been taken in the prosecution since the stay.

22.    Plaintiff has subsequently filed a *Motion to Reopen Administratively Stayed Case*, which was granted.

## V.    FACTUAL BACKGROUND[4]

23.    On October 24, 2018, Plaintiff Steven Young and Latrice Robinson were having a casual conversation outside of the apartment complex at 11445 Bard Avenue, where they resided.

24.    Mr. Young was sitting on his idle motorcycle while they talked.

_____

[2] R. Doc. 3-2 at 1.
[3] R. Doc. 5.
[4] Latrice Robinson's factual allegations can be found in the original complaint (R. Doc. 1-2) at paragraphs 4-35.

25.    At approximately 2:52 P.M., two officers from the since-abandoned Baton Rouge Police Department Street Crimes Unit pulled up to Mr. Young and Ms. Robinson in their BRPD white Dodge Charger.

26.    The officers immediately and without evidence accused Mr. Young of possessing a marijuana blunt, which Mr. Young denies.

27.    Per Baton Rouge ordinance, a suspect alleged to possess a small amount of marijuana "shall not be taken into custody by the arresting officer, but instead shall be required either to deposit his driver's license with the arresting officer or give his written promise to appear." Baton Rouge Code of Ord. Sec. 13:966(d).

28.    Despite this ordinance and without provocation, the officers tackled Mr. Young off his motorcycle and onto the pavement.

29.    Mr. Young was not in a position to flee on the motorcycle or otherwise, according to several eye witness accounts.

30.    The officers deployed a TASER on Mr. Young and pinned him on the ground.

31.    While pinned, by one officer, the other officer began violently dragging Mr. Young while the other punched him in the face, bouncing his head off of the pavement.

32.    These actions were captured on video by a bystander filming from her apartment complex.



**Fig. 1 – Screenshot from bystander video**

33.    The officers then handcuffed Mr. Young and both kneeled on top of him for several minutes. This was also captured on video by other bystanders.



**Fig. 2 – Screenshot from bystander video**

34.     The officers punched Mr. Young in the face several more times while he was handcuffed and pinned on the ground.



**Figs. 3, 4 – Screenshots from bystander video**

35.     The videos show that Mr. Young was compliant and not resisting.

11

36.     After several minutes, additional BRPD officers arrived to complete the arrest and load Mr. Young into a vehicle.

37.     Following the arrest and assault, Mr. Young was not immediately taken to the hospital or to processing.

36.     Instead, Mr. Young was transported to the now-infamous "BRAVE Cave' where he was subjected to an unnecessary cavity search.

37.     The "BRAVE Cave" is a warehouse near Plank Road, now known to have been a black site for BRPD officers to interrogate and torture suspects.

38.     BRAVE is an acronym for "Baton Rouge Area Violence Elimination."[5]

39.     The BRAVE team was BRPD's "Street Crimes"[6] unit or "Violent Crime Enforcement Unit."[7]

40.     Ironically, the BRAVE team was supposed to spread a "No Violence Message."[8]

41.     The BRAVE team began in 2012 as Baton Rouge introduced as part of a "focused deterrence" model of crime.[9]

42.     Focused deterrence works from a purported "carrot and stick" model.[10]

43.     The BRAVE team was the "stick" in that metaphor.

44.     The BRAVE team turned into the Street Crimes unit, and further emphasized its hypermilitarized presentation.

---

[5] BRPD Intra-Divisional Procedure No. 501/96-6 at I(B)(4).
[6] BRPD General Order No. 114, pg. 9.
[7] BRPD Intra-Divisional Procedure No. 501/13-1.
[8] BRPD Intra-Divisional Procedure No. 501/13-1.
[9] https://slate.com/news-and-politics/2023/10/louisiana-police-reform-baton-rouge-torture-warehouse.html
[10] Id.

45.     For example, this is how the Street Crimes Unit presented itself:[11]



**Fig. 5 – Screenshot from Street Crimes Unit video**

46.     In 2019, Officer Troy Lawrence, Sr., described the Street Crimes Unit as "the aggressive side of us," meaning BRPD.[12]

47.     In that context, the Street Crimes Unit began using a warehouse known as the Plank Road facility, or the "BRAVE Cave."

48.     The Plank Road facility is located at 2864 Shelley St, Baton Rouge, LA 70805.

49.     It was built approximately 19 years ago, and has been used by "specialized" BRPD units for about the last decade.[13]

50.     It looks like this:

---

[11] https://www.youtube.com/watch?v=jSdve3hLJ9A&ab_channel=FOX
[12] https://www.youtube.com/watch?v=jSdve3hLJ9A&ab_channel=FOX
[13] batonrougela-2023-09-27-Metropolitan_Council-808-6597 at 1:26



**Fig. 6 – Photo of BRAVE Cave exterior**

51.     Mr. Young was taken to the BRAVE Cave immediately following his arrest, before receiving any medical attention.

52.     At the BRAVE Cave, officers interrogated him and subjected him to a cavity search.

53.     Mr. Young was later booked into the East Baton Rouge Parish Prison (EBRPP), where he was subjected to a second cavity search despite never leaving law enforcement custody.

54.     Officers at the BRAVE Cave would have known that Mr. Young was subject to a search at EBRPP, as it is a policy requirement to search before processing into holding.

55.     Thus, even if the arrest was lawful, at least one cavity search was unnecessary and only used for purposes of harassment, humiliation, and intimidation.

56. Mr. Young suffered uniquely egregious emotional damages by being taken to the BRAVE Cave, where he feared extrajudicial punishment for his alleged crimes.

57. As of the date of this Amended Complaint, no prosecutorial body has brought any formal charges against Mr. Young regarding the 2018 arrest.

58. On August 4, 2023, Mr. Young was riding his motorcycle when a white Dodge Charger – the same make and model from the 2018 encounter – activated its sirens.

59. Fearing another beating, Mr. Young abandoned the motorcycle and ran into a back yard.

60. BRPD officers engaged Mr. Young as one slammed him to the ground, kneeled on his back, and shouted "I'm going to fucking beat the fuck out of you" with a raised fist.

61. The officer kneeling on Mr. Young's back then struck him on the head several times while another deployed a TASER for several seconds.

62. Officers then handcuffed Mr. Young and told him to roll over. Mr. Young complied.

63. Officers then instructed Mr. Young not to "ball up." Mr. Young complied.

64. Officers then instructed Mr. Young to put his legs out. Mr. Young complied.

65. Despite complying and despite Mr. Young being handcuffed, one officer deployed his TASER another time.

66. Mr. Young feared that the officers were going to kill him.

67. As a result of the excessive TASER use, Mr. Young lost the ability to use his legs to stand up or walk, telling the officers that his legs felt "like spaghetti."

15

68.     Officers are heard on body-cam footage discussing that Mr. Young was suspected of riding a stolen motorcycle, which was the impetus for the pursuit, but the motorcycle belonged to Mr. Young.

69.     After Mr. Young was detained in a BRPD vehicle, the officers discussed getting him medical assistance for his injuries.

70.     But when Mr. Young identified himself to officers and mentioned that he had a case pending for the 2018 assault, one officer began laughing and stated "I know who you are" before cutting off the audio on his body-worn camera.

71.     Officers are then seen on camera having a discussion, although the audio does not exist because the officer deactivated the audio.

72.     Following that discussion, Mr. Young was taken to the BRAVE Cave once again.

73.     He was subjected to another humiliating cavity search, again despite the policy that he would be searched upon being processed into EBRPP.

74.     Mr. Young spent approximately 60 days incarcerated for resisting an officer, aggravated flight, and exceeding the speed limit. No steps have been taken in that prosecution.

75.     On information and belief, since 2018, BRPD's Street Crimes Unit has conducted strip searches on thousands of individuals at the BRAVE Cave.

76.     On August 29, 2023, Myron Daniels said he was "very familiar" with the facility, and that it allows "space" to process evidence and arrestees, and has a "holding" facility.

77.     He said there "is nothing secretive about this narcotics processing facility," and that as of the first half of 2023, "one unit within our organization has processed right about 350 individuals" and that in 2022, "there was approximately 650 people processed at this facility."[14]

78.     On information and belief, of those individuals hundreds were individuals whose detention was based solely on reasonable suspicion of wrongdoing (or less).

79.     On information and belief, hundreds of these individuals were released without formal arrest.

80.     For example, on January 9, 2023, BRPD officers including Troy Lawrence, Jr. and Officer Wallace arrested Jeremy Lee, who is 21 years old, 5'6", and weighs 125 pounds without reasonable suspicion or probable cause.

81.     Jeremy Lee yelled in pain while Lawrence and Wallace pulled down his pants and searched him.

82.     While Mr. Lee was handcuffed and on the ground, Lawrence told him, "I'm about to beat the living crap out of you."

83.     They took Lee to the Plank Road black site.

---

[14] https://www.youtube.com/watch?v=1ERLKzkOrtY&t=8s&ab_channel=WBRZ at 6:20.



**Fig. 7 – Screenshot of Jeremy Lee from body-camera footage.**

84.    While there, they took him out of a holding cell and severely beat him.

85.    Lawrence and Wallace repeatedly punched and kicked Mr. Lee.

86.    Mr. Lee was so badly beaten that authorities at East Baton Rouge Parish Prison refused to accept him when Wallace and Lawrence attempted to transfer Mr. Lee to their custody, insisting that Mr. Lee be taken to the hospital.

87.    Mr. Lee was diagnosed with broken ribs and other physical injuries as a result of his beating.

88.    Lawrence and Wallace constructed a false police report accusing Mr. Lee of attempting to escape from the torture warehouse.

89.    Lawrence accused Mr. Lee of committing a "battery" against him, though the narrative portion of the report does not actually claim that Mr. Lee ever touched him.

90.    On Saturday June 10, 2023, BRPD officers stopped Ms. Ternell Brown and her husband. They searched her car without consent or warrant. They found prescription medication that Ms. Brown was in lawful possession of. They forcibly took her to the Plank Road BRAVE Cave, where they subjected her to strip and body cavity searches.

91.    Lawrence and the other officers forced her to spread her vagina and buttocks for inspection and examined her vagina using a flashlight.

92.    They released Ms. Brown without charge.

93.    Then-BRPD Chief Murphy Paul personally received a complaint regarding the torture warehouse and Wallace/Lawrence's misconduct in January 2023; a second Internal Affairs complaint was received in April 2023.

94.    It was only when the *public* learned of these allegations in September 2023 that the torture warehouse was shuttered and Lawrence was forced out of BRPD.

95.    At a press conference on August 29, 2023, called to address the allegations that the Street Crimes Unit ran a "torture warehouse," Myron Daniels offered a false and misleading timeline regarding his and Chief Paul's knowledge about the allegations.

96.    He also falsely claimed that there was "nothing secretive" about the torture warehouse (though, ironically, Daniels kept secret his own longstanding knowledge of allegations of wrongdoing there, and also simultaneously claimed that the Street Crimes Unit officers secretly called the facility "the BRAVE Cave," unbeknownst to him or Chief Paul).

97.    Daniels stated: "Just some notes and a timeline as far as, uh, some of the things that have recently occurred. We recently received a complaint involving one of the officers associated

with that case. That complaint came in as early as August 11. It was followed up by the supervisor who took the complaint on August 13. That supervisor wrote a letter to Internal Affairs to have that case investigated."[15]

98.    In fact, the complaint regarding torture by Troy Lawrence, Jr. and other members of the Street Crimes Unit at "the BRAVE Cave" were received by Chief Paul personally in January 2023 and by Internal Affairs in April 2023.

99.    At the same press conference, Chief Paul admitted that BRPD received the BRAVE Cave complaint on April 25, 2023.[16]

100.    But Chief Paul said that the formal investigation into the BRAVE Cave was not initiated until August 28, 2023.[17]

101.    That is to say, Chief Paul was personally informed about the BRAVE Cave months before Carrie Mealey was taken there.

102.    He took no action until months later.

103.    On August 31, 2023, Mayor Weston Broome announced the closure of the facility and the disbanding of the street crimes units.

104.    On September 27, 2023, Chief Paul described the BRAVE Cave in benign terms: as a "narcotics processing center" that was "used by specialized divisions like narcotics and street

---

[15] https://www.youtube.com/watch?v=1ERLKzkOrtY&t=8s&ab_channel=WBRZ
[16] https://www.youtube.com/watch?v=1ERLKzkOrtY&t=8s&ab_channel=WBRZ at 12:35.
[17] batonrougela-2023-09-27-Metropolitan_Council-808-6597

crimes unit as a processing room for prisoner processing, paperwork writing, and packaging evidence after arrests."[18]

105.    He said there is a "digital watchdog" system that records from nine cameras at the facility.[19]

106.    He said there were nine internal affairs investigations and four criminal investigations ongoing related to the facility.

107.    At that meeting, Chief Paul acknowledged that the problems with the Street Crime unit were not one individual, but the "patterns and practices" of that unit.[20]

108.    Paul said that "unfortunately, we have dealt with a matter like this before."[21]

109.    At the same meeting, Mayor Weston Broome said she was aware of "elements within the institution [BRPD] which focus on excessive force."[22]

110.    At that meeting, Paul revealed that Troy Lawrence Jr. was transferred to Street Crimes by his father, Troy Lawrence Sr.[23]

111.    When pressed about why an officer with Troy Jr.'s disciplinary history would be put in a specialized unit, Paul said "mistakes were made."[24]

112.    One council member said Troy Jr. "has been a repeated bad actor, and he has stayed on our police force."[25]

---

[18] batonrougela-2023-09-27-Metropolitan_Council-808-6597 at 2:24.
[19] *Id.*
[20] *Id* at 1:01:40.
[21] *Id.* at 6:08
[22] *Id.* at 10:11.
[23] batonrougela-2023-09-27-Metropolitan_Council-808-6597 at 1:27:30
[24] batonrougela-2023-09-27-Metropolitan_Council-808-6597 at 1:28:50.
[25] batonrougela-2023-09-27-Metropolitan_Council-808-6597 at 1:30:30.

113.    BRPD's system of accountability for its officers long has been and is currently now completely broken.

114.    In September of 2005, the population of Baton Rouge swelled as many residents of New Orleans, a majority Black city, sought refuge from Hurricane Katrina and the resultant flood. The Michigan State Police and New Mexico State Police both sent troopers to assist the BRPD in policing the city's rapidly growing population.

115.    Within three days of the troopers' arrival, both state police agencies had ordered their troopers to cease operations with BRPD after the troopers witnessed and complained of egregious misconduct and potentially criminal actions by BRPD officers.  One state trooper from Michigan said Baton Rouge police attempted to thank him for his help by letting him "beat down" a prisoner.[26] A spokeswoman for the Michigan State Police told a reporter that "troopers observed Baton Rouge police officers engage in actions that were an affront to their sense of dignity and respect."

116.    Members of both the Michigan State Police and the New Mexico State Police shared observations and concerns that were compiled in a formal letter of complaint to the BRPD. One Trooper reported that "I personally believe that most of the Baton Rouge Police Department are good officers that are being directed by their supervisors to crack down on the public. I don't know if they have been given any type of direction as to what is right or wrong."[27]

117.    No discipline was taken against these officers.

---

[26] Jarvis DeBerry, *Before killing Alton Sterling, Baton Rouge police had a history of brutality complaints,* The Times-Picayune, July 6, 2016.
[27] *Id.* at 9.

22

118.    As writer Jarvis DeBerry put it: "So that's what we're dealing with: a police department whose behavior worried other law enforcement officials and whose leadership has been more defensive than responsive to the claims of racist policing."[28]

119.    Examples of reported BRPD misconduct has included multiple instances of excessive force, including force directed at minors, through the use of tasering, hitting, choking, and pepper spraying of residents, without warning or threat to the safety of officers or civilians; searches of individuals and their vehicles without reasonable suspicion or probable cause; and possibly falsifying information in police reports.

120.    The Baton Rouge Police Department, under the direction of Mayor Holden and predecessors in office of Chief Dabadie, also resisted efforts of media and public interest advocates to gain information regarding these post-Katrina abuses, as part of an ongoing effort to cover up and conceal officer misconduct, and to promote the police code of silence.

121.    In 2006, as part of the effort to cover up and conceal allegations of officer misconduct and to promote the police code of silence, the City/Parish and the BRPD actively resisted public records requests and a Public Records Law enforcement action filed by The Advocate newspaper seeking access to the Internal Affairs Division investigative report. Dabadie's predecessor in office authorized a meritless countersuit to delay and thereby shield investigation records from public view, while imposing high costs on the newspaper.

122.    In 2011, then-BRPD Chief Dewayne White publicly stated that ten percent of the department's officers failed to exercise basic levels of professionalism, and that "it's become so

---

[28] DeBerry, *supra.*

ingrained" in the minds of some officers that they "believe that everybody they come across or most people they come across with that color of skin is probably a criminal." Defendant Mayor Holden fired Chief White in 2013 and hired Dabadie in his place.

123.    In September 2014, a series of racist text messages sent by a BRPD officer to a civilian were published.  In the messages, the officer, a fifteen-year veteran of the department, referred both to Black colleagues and civilians with racial epithets, and stated, *inter alia*, "I wish someone would pull a Ferguson on them and take them out. I hate looking at those African monkeys at work . . . I enjoy arresting those thugs with their saggy pants."

124.    The officer was placed on administrative leave by BRPD and resigned before any disciplinary action was taken against him by the Department. On information and belief, no action was taken by Holden, Dabadie or the City/Parish to determine the extent of similar attitudes among other BRPD officers.

125.    Dabadie stated publicly that there was no need to do so, because the issue was confined to the lone officer. Dabadie's conclusion is belied by more recent stories, including reporting that a White BRPD officer texted his colleagues a picture of a chimpanzee and the phrase "chimp out" in the context of the Alton Sterling protests.[29]

126.    BRPD has also had a policy, practice, or custom of excessive use of force. Recent allegations include:

> (a) a 2007 arrest on a complaint of "loud music" with pepper spray and force that caused the rupture of the arrestee's bladder;

---

[29] Jim Mustian, *Baton Rouge Officer suspended after alleged racial message about Alton Sterling protests*, The Advocate, May 22, 2017.

(b) a 2008 arrest for smoking marijuana that fractured the skull of the arrestee causing internal bleeding and permanent brain damage;

(c) a 2011 incident in which an officer instructed a man, who advised the officer he was intoxicated, to move a vehicle away from the scene of the arrest; when the drunk driver crashed the car, the officer shot him to death and shot a bystander in the arm;

(d) a 2014 incident in which BRPD officers strip-searched a visitor to a home which was being searched by the officers, then kicked the visitor with such force that his head slammed into the floor, knocking several teeth out of his mouth;

(e) a 2015 incident in which two members of the news media were handcuffed, and one arrested, for taking pictures of an arrest;

(f) a 2016 incident caught on video in which a sixteen-year-old was held down by multiple officers while one officer repeatedly punched him in the head;[30] and

(g) the shooting death of Alton Sterling in July 2016.[31]

127.    The BRAVE team's abuses followed in a long history of BRPD officers forming units called "jump out boys" who engaged in illegal searches, seizures, and uses of force on Baton Rouge citizens.

128.    For example, BRPD officer Christopher Taylor testified that "jump out boys" referred to BRPD's "criminal patrol unit."[32]

129.    In recent years, suits against the City/Parish for BRPD's excessive uses of force and unconstitutional arrests have resulted in sizeable yearly settlements by the Parish Attorney. For example, the City/Parish paid $372,434 to settle such cases in 2015, $581,286 in 2014, and $437,112 in 2011. In just one case in 2023, regarding 2016 conduct, the City/Parish paid $1.17

---

[30] DeBerry, *supra.*
[31] *See Andricka Williams v. The City of Baton Rouge*, 19th Judicial District Court.
[32] Taylor Deposition at 24:3-23.

million.

130.    These abuses resulted from a systemic failure of accountability in BRPD.

131.    Carl Dunn, a retired BRPD deputy chief who is now police chief in the nearby city of Baker, says that before "Murphy Paul, the running joke — all over the state of Louisiana — was that the Baton Rouge Police Department didn't have an Internal Affairs."[33]

132.    According to Dunn, internal affairs "didn't exist before [Paul]. There was no accountability, none."[34]

133.    "There wasn't really a need for them (officers) to come out and take revenge on people that file complaints because the complaint didn't go anywhere anyway," he said. "It was going to be unsustained anyway."[35]

134.    Dunn, who retired from the department in 2015 and now is the police chief in the nearby city of Baker, said that, on some occasions, Internal Affairs officers would coach the officers accused of improper use of force off the record on what to say before the formal interview.[36]

135.    "Man, if you just knew how many people were told, 'Who you think we going to believe? You? Or the sworn police officer? That leaves his loved ones at home and come out here and try to save the world,'" he said. "'Who you think we're going to believe? Do you really want to file this complaint?'"[37]

---

[33] Sosin and Khan, *'Baton Rouge, we are sorry.' A new police chief pushes for change*, Verite, October 11, 2023.
[34] *Id.*
[35] *Id.*
[36] Sosin and Khan, *'No further action taken': Who is policing the police?,* Verite, April 17, 2023.
[37] *Id.*

136.    "There was a culture where the officers, both Black and white, in the police department, could basically do anything they wanted on the streets with no consequence to the citizens, Black or white," said Chauna Banks, a Baton Rouge Metro Council member.[38]

137.    This culture of impunity resulted in mass constitutional violations.

138.    For example, in 2016, in response to BRPD misconduct, thousands of Louisiana residents protested BRPD in 2016.  BRPD responded with mass arrests of the protesters.

139.    BRPD engaged in hundreds of arrests, hundreds of uses of excessive force, and hundreds of examples of falsification of perjured affidavits of probable cause.

140.    Even though the streets had already been cleared,[39]  BRPD officer David Wallace then gave an order over the interop radio channel to execute mass arrests: "Everyone has violated. Everyone is under arrest. Those who can safely apprehend violators must do so."[40]

141.    Law enforcement followed the BRPD order that "everyone" was under arrest. They swept in and began making mass arrests of protesters on private property and the curb.[41] BRPD officers went "into the yard and beg[a]n making detentions."[42] Protesters were arrested even though the "vast majority of people were on private property" and were "outside of the public passages."[43]

---

[38] Sosin and Khan, 'No further action taken': Who is policing the police?, Verite, April 17, 2023.

[39] *Imani*, Plaintiff's MSJ, Ex. S at 90:5-9 ("Q. . .  This is a situation where the streets are cleared, and then the troopers move forward, agree? A. There is nobody in the street. I would agree to that, yes, sir.")

[40] *Imani*, Plaintiff's MSJ, Ex. U at 144:8-18 ("Q. Just to repeat what it sounded to me like he said, it was, You've got one of the leaders requesting to walk on the sidewalk past France. Someone else responds, It's too late. Then 10-9. Then responds, Too late. Everyone has violated. Everyone is under arrest. Those who can safely apprehend violators must do so. Primary targets are the white male, red hair, tie-dyed shirt, and everyone else who is violating, which is everybody out there. Does that sound about right? A. Yes, sir.")

[41] See Ex. J at 83:18-84:1 (Dohm) (protesters were arrested in private property and on the sidewalks)

[42] Ex. CC at 90:1-7.

[43] Ex. V at 122:16-19 ("Q The vast majority of people were on private property, though; is that accurate? A Yes, they were outside of the public passages, yes.")

The "whole yard was cleared of protesters,"[44] even though BRPD had no "reason think that those protesters standing on private property at East and France Street did not have permission to be there."[45] Even those protesters who were trying to disperse, as Defendants ordered them to do, were arrested.[46]

142.    Then-BRPD-Chief Dabadie explicitly shielded the BRPD response from Internal Affairs investigation by telling all IA investigators to "stay in the office."

143.    Sgt. Beard testified that "Every member of my office was advised to stay in the office. No Internal Affairs investigators were at any protests. We were all given an order to remain in our office."[47] He said this order would have been given by Chief Dabadie.[48]

144.    Lawsuits followed, which uncovered abundant evidence of BRPD misconduct, ranging from unreported uses of force, to orders to engage in mass arrests of protesters, to admissions of forged signatures on sworn documents.

145.    The evidence of misconduct was so strong that the City of Baton Rouge settled one case during trial for $1.17 million.[49] Other lawsuits stemming from those protests are still ongoing.

146.    Despite the strength of that evidence, BRPD's Internal Affairs department never

---

[44] Ex. CC at 90;4-7.
[45] Ex. Y (30b6 Witness Dep.) at 186:23-187:2.
[46] *North Baton Rouge Matters v. City of Baton Rouge*, M.D. La. 16-cv00463-JWD-RLB ("NRBM"), R. Doc. 2-8 at 3 (Affidavit of Legal Observer McDaniel) (protester attempted to leave, and told an officer "that he needed to get to his car to go to work. As he walked to his car, police officers arrested him."); *id*., R. Doc. 2-9 at 13 (Aff. of Legal Observer Lily Ann Ritter) ("I also heard police officers tell people that they needed to disperse several times. However, police were blocking all surrounding intersections and there was nowhere for people to go. Protesters who wanted to leave were not able to do so."
[47] *Imani v. Baton Rouge*, 17-cv-439, R. Doc. 291, Ex. Y at pg. 64.
[48] *Id*.
[49] https://www.law360.com/access-to-justice/articles/1577517/how-baton-rouge-activists-won-a-rare-civil-rights-settlement

conducted any investigation into any officer conduct related to the protests, with one exception.[50]

147.    That exception was that BRPD Internal Affairs investigated one officer for saying that BRPD was "violating peoples' rights, wrongfully arresting them."[51]

148.    During litigation, BRPD did not open investigations into its officers, even after they repeatedly refused to answer questions on the grounds that their answers might incriminate them in a crime.

149.    For example, Officer Jonathan Abadie plead the Fifth to a range of questions including:

  •    "[W]hen you signed your name to this document under oath, swearing as to the truth of the contents of it, were you lying?"[52]

  •    "[W]hen you signed this document under oath, swearing as to the truth of the contents of it, were you committing perjury?"[53]

  •    "[W]hen you signed this affidavit under oath, swearing as to the truth of its contents, were you manufacturing false evidence?"[54]

  •    "[W]hen you signed this document under oath, swearing to the truth of the contents of it and then that document you knew would be used to imprison Samantha Nichols at East Baton Rouge Parish Prison, were you committing false imprisonment?"[55]

150.    No investigation into Abadie was opened.

151.    Even when multiple officers reported to their chain of command that some officer

---

[50]*Imani v. Baton Rouge*, 17-cv-439, R. Doc. 291, Ex. E at 14:19-25 ("Q So we can conclude that there were no -- Internal Affairs had no reports of violations or investigations of any Baton Rouge police officers other than that one accountability form we looked at in the Marcus Thompson investigation. Agreed? A Agreed.")
[51] *Imani v. Baton Rouge,* 17-cv-439, R. Doc. 291, Ex. F at 2.
[52] *Id*. at 46:13-47:3.
[53] *Id*. at 47:5-17.
[54] *Id*. at 47:18-48-5.
[55] *Id*. at 48:6-20.

was forging their names on affidavits of probable cause, BRPD did not conduct any investigation.

152.    At trial, BRPD representatives said that Internal Affairs never conducted any investigation because there was no citizen complaint.

153.    On May 15, 2023, however, a citizen complaint was filed. It was directed to Chief Paul, and contained evidence and testimony that:

- BRPD officers signed pre-written affidavits of probable cause under oath, even though they knew the contents were false;

- BRPD officers' signatures were repeatedly forged;

- BRPD officers ordered the mass arrest of protesters who were complying with                               police                               directions;

- BRPD applied its "Civil Disorder" policy to protesters "because of the content                of                their                speech";

- BRPD officers violated policy by failing to file use of force reports;

- BRPD officers admitted they were "messing around" with an untested, untrained weapon system when they used it an protesters; and

- Then-Chief Dabadie ordered all internal affairs investigators to "stay in the office.

154.    Chief Paul was subjectively aware of the complaint, because he called the author on the phone to discuss it.

155.    He did not, however, authorize any investigation whatsoever.

156.    He refused to have BRPD investigate the matter even though according to BRPD materials, an "investigation will be conducted in all citizen complaints involving employees of the

BRPD."[56] And "[g]rievances will be thoroughly and impartially handled."[57]

157.    An investigation by Verite News found that between 2009 and 2018, Internal Affairs ruled 86% of the 308 use-of-force complaints investigated as "exonerated" or "not sustained."[58]

158.    In 2017, that number rose to 100%, according to the department's data.[59]

159.    A retired New York Police Department official, who worked in the NYPD's internal affairs bureau, said after seeing the data from 2017 that a year without a single sustained internal investigation into use of force is almost statistically impossible, no matter the department.[60]

160.    Under this absence of accountability or discipline, officers engaged in a pattern of misconduct just like what happened to Plaintiffs.

161.    For example, BRPD Officer Jeremiah Ardoin explained that narcotics officers had a verbal policy requiring a quota of arrests.

162.    The quota was enforced by taking away officers' overtime.

163.    "At least three to four nights a week they would have us riding through the neighborhoods," Ardoin said. "If you saw a random black person walking around the street and hasn't done anything, they would tell us just to jump out the vehicle, grab them and pat them down without probable cause. I voiced my opinions several times, and I didn't agree with that."[61]

---

[56] https://www.brla.gov/1821/File-a-Complaint
[57] *Id.*
[58] '*Baton Rouge, we are sorry*", supra.
[59] Id.
[60] Sosin and Khan, '*No further action taken': Who is policing the police?*, Verite, April 17, 2023.
[61] Chris Nakamoto, *BRPD Narcotics officer exposes wrongdoing, coverups and quotas in bombshell interview with Nakamoto*. WBRZ  April 28, 2021.

164.    "We normally ride two people to a vehicle and each person had to have one arrest before the end of the shift," Ardoin said.

165.    According to Ardoin, at least one colleague would openly brag about "planting drugs" on people.[62]

166.    He would brag that "search warrant is never dry if he brings his own supply."[63]

167.    Ardoin wrote a memorandum detailing some of the problems he saw, such as stops without reasonable suspicion: "For instance, if a black male was seen walking in the street, they would instruct us to contact him and pat him down," Ardoin wrote.[64]

168.    But the absence of accountability continued after Murphy Paul was appointed chief.

169.    Paul was appointed Chief in January 2018.

170.    In 2018, now-Deputy Chief Myron Daniels (then Internal Affairs Commander) personally shut down a meritorious Internal Affairs investigation into wrongdoing by Lorenzo Coleman, who was tasked with running the Street Crimes Unit.

171.    Deputy Chief Myron Daniels and Street Crimes Unit head Lorenzo Coleman operate a consulting group doing business as "Armor Consulting Group" (ACG) from which they gain additional income.

---

[62] *Id.*
[63] *Id.*
[64] Skene, *Alleged corruption in BRPD narcotics unit includes stolen drugs, illegal searches, planted evidence,* Advocate March 5, 2021.

172.    Daniels holds himself out at the "President" of the organization; Coleman holds himself out as the "Chief Operating Officer."



**Figs. 8, 9 – Screenshots from Armor Consulting Group**

173.    Daniels was promoted to become Paul's Deputy Chief and Chief of Staff in 2020.

174.    Because he has a business partnership with Coleman and because the two men share an interest in maintaining their reputation as police reformers, Daniels should have recused himself from an Internal Affairs or misconduct investigation into the Street Crimes Unit that Coleman oversaw.

175.    But Daniels has never recused himself from any Internal Affairs or misconduct investigation into wrongdoing by Coleman, the Street Crimes Unit, or individual officers associated with the Street Crimes Unit.

176.    Daniels remains involved in overseeing the investigation into Coleman, the Street Crimes Unit, and "the BRAVE Cave" to this day, despite the fact that Street Crimes Unit operations there were run by his business partner, Lorenzo Coleman.

## VI.   CLAIMS FOR RELIEF[65]

## Count I – 42 U.S.C. § 1983: Unreasonable Search and Seizure, Excessive Force, Theft of Property, and Substantive Due Process

### *Plaintiff Steven Young against All Defendants*

177.    **Search and Seizure:** In terms of definitions, (1) a "strip search" occurs when a suspect is required to remove his clothes; (2) a "visual body cavity search" is one in which the police observe the suspect's body cavities without touching them (as by having the suspect to bend over, or squat and cough, while naked); (3) a "manual body cavity search" occurs when the police put anything into a suspect's body cavity, or take anything out.[66]

178.    The Fourth Amendment requires that the greater the intrusion, the greater must be the reason for conducting the search.  Thus, visual body cavity searches require a higher level of suspicion than strip searches.[67]

179.    "[A]ll courts have recognized the 'severe if not gross interference with a person's privacy' that accompany visual body-cavity searches."[68]

---

[65] Latrice Robinson has asserted Federal Constitutional claims under the Fourth and Fourteenth Amendments for unlawful arrest, use of force, manufacturing of false evidence, malicious prosecution, failure to train, failure to supervise, and failure to discipline, as described in detail in R. Doc. 1-2, ¶¶ 36-39. Latrice Robinson has also asserted State Law claims for false arrest, false imprisonment, aggravated assault, aggravated battery, intentional infliction of emotional distress, defamation, malicious prosecution, intentional misrepresentation, abuse of process, negligent hiring, negligent retention, and negligent supervision as described in detail in R. Doc. 1-2 ¶¶ 40-42.

[66] *Gonzalez v. City of Schenectady*, 728 F.3d 149, 158 (2d Cir. 2013)

[67] *Fuller v. M.G. Jewelry,* 950 F.2d 1437 (9th Cir. 1991) (body cavity search requires probable cause and warrant absent exigent circumstances); *McKinley v. Trattles,* 732 F.2d 1320 (7th Cir. 1984) (upholding damages for anal cavity search by guard); *Salinas v. Breier,* 695 F.2d 1073 (7th Cir. 1982) (must have probable cause person is hiding controlled substance in cavity).

[68] *Florence v. Board of Chosen Freeholders of County of Burlington*, 132 S.Ct. 1510, 1527 (2012) (Alito, J., concurring), citing Blackburn v. Snow, 771 F.2d 556, 564 (C.A.1 1985)

180.    "Even when carried out in a respectful manner, and even absent any physical touching,  . . .such searches are inherently harmful, humiliating, and degrading."[69]

181.    "[V]isual body cavity searches must be justified by specific, articulable facts supporting reasonable suspicion that an arrestee is secreting contraband inside the body cavity to be searched."[70]

182.    Here, Plaintiff Steven Young was subjected to unnecessary and harmful cavity searches following both his 2018 and 2023 arrests.

183.    Specifically, Defendants performed a cavity search on Mr. Young while at the BRAVE Cave, despite knowledge that he would be searched when processing him at EBRPP.

184.    These searches were unreasonable in that:

a.    There was insufficient justification for initiating the search,

b.    The scope of the particular intrusion was unreasonable.

c.    The place in which the search was conducted was unreasonable,[71]

d.    The manner in which the search was conducted was unreasonable,[72]

e.    The officers lacked reasonable suspicion or probable cause to search Plaintiffs' anus,[73]

---

[69] *Florence v. Board of Chosen Freeholders of County of Burlington*, 132 S.Ct. 1510, 1527 (2012) (Alito, J., concurring)

[70] *Sloley v. VanBramer*, 945 F.3d 30, 33 (2d Cir. 2019).

[71] *United States v. Williams*, 477 F.3d 974, 977 (8th Cir. 2007); *Meeks, below*, 822 F.Supp.2d at 923 (Defendant Officers failed to avail themselves of any less intrusive alternatives to strip searching Plaintiff on a public road).

[72] *Schmidt*, 557 F.3d at 572 (citing *Bell v Wolfish*, 441 U.S. 520, 559 (1979)); *see also Meeks v. City of Minneapolis*, 822 F.Supp.2d 919, 922 (D. Minn. 2011).

[73] *Hunter v. Auger*, 672 F.2d 668, 674 (8th Cir. 1982).

      f.      There were no exigent circumstances requiring the search after Plaintiff was already detained and en route to EBRPP,[74] and

      g.      There was no exception to the warrant requirement for the search.[75]

185.     As a direct and proximate result of this deprivation of their constitutional rights to be free from unreasonable searches and seizures, Plaintiffs suffered injuries, both physical and emotional.

186.     **Excessive Force**: "To prevail on an excessive force claim, a plaintiff must establish: '(1) injury (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable.'"[76]

187.     "[I]t may be objectively reasonable under certain circumstances for police officers to use physical force when a person refuses to comply with an officer's lawful commands—but not after that person has begun to comply."[77]

188.     Once a suspect is "subdued" and "no longer resisting, an officer's subsequent use of force is excessive."[78]

189.     Here, the force used on Plaintiff Steven Young, in both instances, was excessive given the need, including the strikes to the face and body, deploying the TASER after Mr. Young was already handcuffed and compliant, etc.

---

[74] *Campbell v. Miller,* 499 F.3d 711, 719 (7th Cir. 2007).

[75] *Coolidge v. New Hampshire,* 403 U.S. 443, 455 (1971); *Scott v. Harris,* 550 U.S. 372, 380-81 (2007).

[76] Freeman v. Gore, 483 F.3d 404, 416 (5th Cir. 2007) (Dennis, J.) (quoting Tarver v. City of Edna, 410 F.3d 745, 751 (5th Cir. 2005)).

[77] *Bagley v. Guillen*, No. 22-20644, 2024 U.S. App. LEXIS 680, at *1 (5th Cir. Jan. 10, 2024) (emphasis added).

[78] *Carroll v. Ellington,* 800 F.3d 154, 177 (5th Cir. 2015).

190.    Furthermore, any resistance by Plaintiff was reasonable given the right to resist an

unlawful arrest.[79]

191.    **Theft of Property:** Defendants violated Plaintiffs' right to private property by

taking his motorcycle without compensation.

192.    **Substantive Due Process:** The repeated strip and visual body cavity searches and

the imprisonment at an off-the-books torture black site violated Plaintiff's right to be free from

substantive due process violations in that the conduct shocks the conscience.

**Count II – First Amendment Retaliation**

*Plaintiff Steven Young against All Defendants*

193.    The First Amendment protects freedom of speech and "the right of the people . . . to

petition the government for a redress of grievances."[80]

194.    "[T]he First Amendment prohibits government officials from taking retaliatory actions

against individuals for engaging in protected speech."[81]

195.    "If an official takes adverse action against someone [for engaging in protected speech],

and 'non-retaliatory grounds are in fact insufficient to provoke the adverse consequences,' the injured

person may generally seek relief by bringing a First Amendment claim."[82]

196.    To prove First Amendment retaliation, a plaintiff must show that "(1) they were

engaged in constitutionally protected activity, (2) the defendants' actions caused them to suffer an

---

[79] *See State v. Ceaser*, 859 So. 2d 639, 643 (2003) ("An individual in Louisiana has a time-honored right to resist an illegal arrest.").

[80] U.S. CONST. amend. I.

[81] *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (quoting *Hartman* v. *Moore*, 547 U. S. 250, 256, 126 S. Ct. 1695, 164 L. Ed. 2d 441 (2006).

[82] *Id.*

injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the defendants' adverse actions were substantially motivated against the plaintiffs' exercise of constitutionally protected conduct."[83]

197.    In 2018, Defendants retaliated against Plaintiff Latrice Robinson for directing insults at them and filming her co-Plaintiff's arrest by subjecting her to arrest for possession and obstruction of justice, despite lacking probable cause for either.

198.    Ms. Robinson's actions were protected under the First Amendment.[84]

199.    In 2023, Defendants retaliated against Mr. Young by taking him to the BRAVE Cave only after realizing that he had filed a lawsuit against BRPD for his 2018 arrest.

200.    "Filing a lawsuit is a type of speech that also implicates the petition clause of the First Amendment."[85]

201.    In both instances, Plaintiffs were engaged in protected speech and their exercise was a motivating factor for the adverse actions.

## Count III – Section 1983 Conspiracy

### *Plaintiff Steven Young against all Officer-Defendants*

202.    "In order to prevail on a section 1983 conspiracy claim, a plaintiff must establish (1) the existence of a conspiracy involving state action and (2) a deprivation of civil rights in

---

[83] *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002); see also *Nieves v. Bartlett*, 139 S. Ct. 1715, 1725 (2019); *Mt. Healthy City Bd. of Ed. v. Doyle*, 429 U. S. 274, 97 S. Ct. 568, 50 L. Ed. 2d 471.
[84] *Brooks v. City of W. Point*, 639 F. App'x 986, 989 (5th Cir. 2016)
[85] *Marceaux v. Lafayette Consol. Gov't*, 921 F. Supp. 2d 605, 636 (W.D. La. 2012) (quoting *Rathjen v. Litchfield*, 878 F.2d 836, 842 (5th Cir. 1989))

furtherance of the conspiracy by a party to the conspiracy."[86]

203.    Here, the yet-unidentified officer-Defendants entered into a conspiracy to use their state powers to deprive Plaintiffs of their civil rights when they worked together to arrest Mr. Young and perform unnecessary battery and searches on Mr. Young.

## Count IV – Failure to Intervene

### Plaintiff Steven Young against all Officer-Defendants

204.    "[A]n officer who is present at the scene and does not take reasonable measures to protect a suspect from another officer's use of excessive force may be liable under section 1983."[87]

205.    "[A]n officer may be liable under § 1983 under [this] theory of bystander liability where the officer '(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act.'"[88]

206.    The yet-unidentified officer-Defendants each observed their fellow officers violating Plaintiffs' constitutional rights, had a reasonable opportunity to intervene, and chose not to act.

## Count V – *Monell* Claim

### Plaintiff Steven Young against City of Baton Rouge and Chief of Police

207.    A Monell claim against a municipality can be established in at least eight different theories: (1) An express policy; (2) A violation by the final policymaker herself; (3) Improper hiring

---

[86] *Pfannstiel v. City of Marion*, 918 F.2d 1178, 1187 (5th Cir. 1990); *see also Jabary v. City of Allen*, 547 F. App'x 600, 610 (5th Cir. 2013) ("To prove a conspiracy under § 1983, a plaintiff must allege facts that indicate (1) there was an agreement among individuals to commit a deprivation, and (2) that an actual deprivation occurred." (citing *Cinel v. Connick*, 15 F.3d 1338, 1343 (5th Cir. 1994)).
[87] *Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995) (citations omitted).
[88] *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013) (citations omitted).

practices; (4) Improper retention practices; (5) Improper supervision/discipline; (6) Deficient

training; (7) Pattern of misconduct; or (8) Ratification by final policymaker.

208.    A government entity and responsible officials can be held liable for the retention of

officers who cause constitutional violations when a plaintiff can demonstrate "deliberate

indifference" to the "known or obvious consequence[s]" of such retention decisions.[89]

209.    Deliberate indifference exists "where adequate scrutiny of an applicant's background

would lead a reasonable supervisor to conclude that the plainly obvious consequences of the decision

to [retain] would be the deprivation of a third party's constitutional rights."[90]

210.    Here, Plaintiffs bring a Monell claim under theories 1, 4, 5, 6, and 7:

a.  An express policy (the unconstitutional BRPD search policy);

b.  Improper retention practices (the choice to retain officers despite repeated misconduct and

violence);

c.  Improper supervision/discipline (the complete breakdown of accountability at BRPD);

d.  Deficient training (the failure to meaningfully train officers on search practices and

constitutional policing); and

e.  Pattern of misconduct (the hundreds or thousands of Baton Rouge citizens abused on the

streets and at the law enforcement black sites in a manner similar to Plaintiffs).

---

[89] *Gomez v. Galman*, 18 F. 4th 769, 778 (5th Cir. 2021), citing *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997).
[90] Gomez, supra, citing Gros v. City of Grand Prairie, 209 F.3d 431, 433-34 (5th Cir. 2000) (citing Snyder v. Trepagnier, 142 F.3d 791, 797 (5th Cir. 1998))

**Count VI – State Law Claims: Violations of the Louisiana Constitution, False Arrest, False Imprisonment, Assault and Battery, Negligence, Negligent Hiring and Failure to Train, and IIED**

*Plaintiff Steven Young against all Defendants*

211.    **Searches and Seizures**: "In Louisiana, the right to privacy ensures that '[e]very person shall be secure in his person, property, communications, houses, papers, and effects against unreasonable searches, seizures, or invasions of privacy.'"[91] "Although the Louisiana Supreme Court has not articulated a clear standard for state constitutional claims alleging excessive force, 'Louisiana federal district courts have noted that principles embodied in the Fourth Amendment have been incorporated into Article I, Section 5 of the Louisiana Constitution.'"[92]

212.    **Excessive Force**: Louisiana Code of Criminal Procedure Article 220 provides, "A person shall submit peaceably to a lawful arrest. The person making a lawful arrest may use reasonable force to effect the arrest and detention, and also to overcome any resistance or threatened resistance of the person being arrested or detained." La. Code Crim. Proc. art. 220. "The use of force by law enforcement officers must be tested by the 'reasonable force' standard established by this article. The test precludes 'clearly inappropriate force.'" *Kyle v. City of New Orleans*, 353 So. 2d 969, 972 (La. 1977) (quoting La. Code Crim. Proc. art. 220, Official Revision Comment (b)).

213.    **False Arrest and False Imprisonment**: "Under Louisiana law, '[f]alse arrest and

---

[91] *Bagley v. Kolb,* No. 19-10, 2021 WL 3376830, at *16 (W.D. La. Aug. 3, 2021) (quoting La. Const. art. I, § 5).

[92]  *Id.* (*quoting Shepherd v. City of Shreveport*, No. 14-2623, 2018 WL 1513679, at *10 (W.D. La. Mar. 27, 2018) (*citing Todd v. City of Natchitoches*, 238 F. Supp. 2d 793, 798–99 (W.D. La. 2002))).

imprisonment occur when one arrests and restrains another against his will without a warrant or other statutory authority. Simply stated, it is restraint without color of legal authority.'" *Elphage v. Gautreaux*, 969 F. Supp. 2d 493, 514 (M.D. La. 2013) (quoting *Kyle v. City of New Orleans*, 353 So. 2d 969, 971 (La. 1977)).

214.    **Assault and Battery**: Defendants' non-consensual touching of Plaintiffs body, and the stripping of their clothes and Shermon's diaper, constituted assaults and batteries. The fact that Defendants stripped Plaintiffs down to their exposed genitals transforms these torts into sexual assault and sexual battery.

215.    **Negligence**: "The duty-risk analysis is the standard negligence analysis employed in determining whether to impose liability under" Article 2315. *Lemann v. Essen Lane Daiquiris, Inc.*, 2005-1095 (La. 3/10/06); 923 So.2d 627, 632–33 (citing *Mathieu v. Imperial Toy Corp.*, 94-0952 (La. 11/30/94); 646 So. 2d. 318, 321).

216.    **Negligent Hiring, Supervision, and Training (Paul, Gautreaux, and City Only)**: Municipal employers have a duty to exercise reasonable care in the hiring, training, and supervision of its employees.  Failure to do so is a cognizable tort under Louisiana Civil Code art. 2315.

217.    **Intentional Infliction of Emotional Distress:** All persons have a duty not to take actions that will inflict severe emotional distress or be substantially certain that severe emotional distress would occur. The repeated strip and cavity searches of Plaintiff Young were intended to and did cause severe emotional distress.

218.    By the actions described above, Defendants violated each of these state law rights.

## Count VI – State Law Conspiracy

### *Plaintiff Steven Young against all Defendants*

219.    "He who conspires with another person to commit an intentional or willful act is answerable, in solido, with that person, for the damage caused by such act."[93] "Louisiana law does not create a self-standing tort of conspiracy; 'rather the actionable element of article 2324 is the intentional tort that the conspirators agreed to commit and committed, in whole or in part, causing plaintiff's injury.' "[94]

220.    That is, "[t]he actionable element of a conspiracy claim is not the conspiracy itself; rather, it is the tort that the conspirators agree to perpetrate and actually commit in whole or in part. Simply stated, the unlawful act is the tortious conduct."[95]

221.    The individual defendants entered into a conspiracy to use their state powers to cause tortious conduct against Plaintiffs.

## Count VII - Vicarious Liability

### *Plaintiff Steven Young against City of Baton Rouge and Defendant Morse*

222.    "At common law, the Latin phrase respondeat superior ('let the master answer') denotes the employer's liability for the employee's tort committed in the course and scope of employment."[96] "The foundation of respondeat superior is the employee's tort. Thus, where the

---

[93] La. Civ. Code. art. 2324.
[94] Snow Ingredients, Inc. v. SnoWizard, Inc., 833 F.3d 512, 526 (5th Cir. 2016) (citation omitted) (affirming dismissal of complaint on Rule 12(b)(6) grounds).
[95] *Thomas v. N. 40 Land Dev., Inc*., 2004-0610 (La. Ct. App. 4th Cir. 1/26/05); 894 So. 2d 1160, 1174 (citations omitted).
[96] 1 Frank L. Maraist, et al., Louisiana Tort Law § 13.02 (2021).

employee was not guilty of a tort, the employer cannot be vicariously liable.'"[97] "Louisiana Civil Code Article 2320 codifies the concept, providing, in part: [']Masters and employers are answerable for the damage occasioned by then-servants and overseers, in the exercise of the functions in which they are employed [.][']"[98]

223.    Here, each Defendant was acting in the course and scope of their employment with regard to all the above acts.

## V.    RELIEF REQUESTED

224.    Plaintiff requests a jury on all claims.[99]

225.    Wherefore Plaintiff requests judgment be entered against Defendant and that the Court grant the following:[100]

    a.    Judgment against Defendants for Plaintiff's asserted causes of action;

    b.    Award of compensatory damages;

    c.    Award of special

    d.    Award of punitive damages against the individual defendants;

    e.    Award costs and attorney's fees;

    f.    Order such other and further relief, at law or in equity, to which Plaintiff may be justly entitled.

---

[97] Id.

[98] *Id.*

[99] Latrice Robinson has also requested a jury trial. R. Doc. 1-2 ¶ 43.

[100] Latrice Robinson has prayed for compensatory damages, punitive damages, attorneys fees, and "other and further relief as may appear just and appropriate." R. Doc. 1-2 ¶ 44.

**RESPECTFULLY SUBMITTED:**

*/s/ William Most*
William Most, 36914
David Lanser, 37764
MOST & ASSOCIATES
201 St. Charles Ave., Ste. 2500, #9685
New Orleans, LA 70170
Telephone: (504) 509-5023
Telephone: (504) 533-4521
Fax: (504) 414-6400
williammost@gmail.com
david.lanser@gmail.com

*Counsel for Plaintiff Steven Young*

45