# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

**STEVEN W. YOUNG, ET AL.**

**VERSUS**

**CITY OF BATON ROUGE, ET AL.**

**CIVIL ACTION**

**NO. 19-886-JWD-SDJ**

## <u>RULING AND ORDER</u>

This civil rights action is brought by two individuals for claims arising from two incidents, years apart, involving officers with the Baton Rouge Police Department ("BRPD") and the BRPD's "BRAVE Cave." (*Second Amended Complaint* ("*SAC*") ¶¶ 1–8, Doc. 46.) Plaintiffs are Steven W. Young and Latrice Robinson (collectively, "Plaintiffs"), (*id.* ¶¶ 11–12), though the *SAC* applies only to Young's claims, (*id.* at 1 n.1).[1] Defendants include: (1) the City of Baton Rouge (the "City"); (2) Chief Thomas Morse, Jr.; (3) six BRPD officers, including Ronald Norman, Jr., Frederick Thornton, Jr., Brett Usey, David Kennedy, Joseph Carboni, and James Thomas, Jr., (collectively, the "Officer Defendants"); (4) Doe Officers 1–20; and (5) ABC Insurance Companies 1–10 (all are, collectively, "Defendants"). (*Id.* ¶¶ 13–22.)

Currently before the Court are two motions to dismiss filed under Federal Rule of Civil Procedure 12 by two Officer Defendants—Norman, (Doc. 77), and Thornton, (Doc. 91).[2] Young opposes the motions, (Docs. 100, 101, respectively), and only Norman filed a reply, (Doc. 106). Oral argument is not necessary. The Court has carefully considered the law, the allegations of the *SAC*, the videos in the record referenced in and central to that pleading (which the parties agree

---

[1] The *SAC* specifically states: "Plaintiff Latrice Robinson remains a plaintiff in this matter, but with separate counsel. Her facts are outlined in the original complaint and incorporated into this Amended Complaint for consistency, although this pleading is only for Plaintiff Young." (*SAC*, Doc. 46 at 1 n.1.)

[2] The motions involving the other Officer Defendants, (Docs. 67, 74, 71, 76), will be taken up separately.

should be considered), and the arguments and submissions of the parties and is prepared to rule. For the following reasons, the Court will grant the motion in part and deny it in part.

## I.   RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

The following allegations are taken from Plaintiff's *SAC*. On October 24, 2018, Young and Robinson were talking outside of the apartment complex where they resided on Bard Avenue. (*SAC* ¶ 29, Doc. 46.) Young was sitting on his motorcycle while they talked. (*Id.* ¶ 30.)

At about 2:52 p.m., two officers from the BRPD Street Crimes Unit pulled next to the Plaintiffs in their patrol unit. (*Id.* ¶ 31.) The two officers immediately accused Young of possessing a marijuana blunt, which Young denied. (*Id*. ¶ 32.)

The *SAC* quotes a Baton Rouge ordinance which prohibits officers from taking a person into custody if they are suspected of possessing a small amount of marijuana. (*Id.* ¶ 33 (quoting Baton Rouge Code of Ord. § 13.966(d)).) Rather, the suspect must promise to appear or deposit his driver's license. (*Id.*)

Despite this ordinance, officers tackled Young to the ground, even though he did not provoke them and even though he was in no position to flee. (*Id.* ¶¶ 34–35.) The officers deployed a TASER on Young and pinned him on the ground. (*Id.* ¶ 36.) While Young was pinned, one officer violently dragged him, and another punched him in the face, bouncing his head off the pavement. (*Id.* ¶ 37.) A bystander captured this incident on video while filming from her apartment complex. (*Id.* ¶ 38.)

Next, the officers handcuffed Young. (*Id.* ¶ 39.) They kneeled on top of him for several minutes. (*Id.*) This too was captured on video by bystanders, and still images of this video are incorporated into the *SAC*. (*Id.*; Figs. 2, 3, 4.)

The officers punched Young in the face several more times while he was handcuffed and pinned on the ground. (*Id.* ¶ 40.) The video shows that Young was compliant and not resisting. (*Id.* ¶ 41.) After several minutes, more BRPD officers arrived, completed the arrest, and loaded Young into a vehicle. (*Id.* ¶ 36a.)[3]

Afterward, Young was not immediately taken to the hospital or for processing. (*Id.* ¶ 37a.) Instead, he was taken to the "BRAVE Cave," where he was subjected to an unnecessary cavity search. (*Id.* ¶ 42.)

The "BRAVE Cave" is a warehouse near Plank Road, now known to have been a "black site" for BRPD officers to interrogate and torture suspects. (*Id.* ¶ 43.) BRAVE is an acronym for "Baton Rouge Area Violence Elimination." (*Id.* ¶ 44.) The BRAVE team was BRPD's "Street Crimes" unit or "Violent Crime Enforcement Unit." (*Id.* ¶ 45.) The *SAC* goes on to provide details about the history of the BRAVE team, most of which are more relevant to the claims against the City than to the instant motions. (*See id.* ¶¶ 46–56.)

Young was taken to the BRAVE Cave immediately after his arrest, before getting medical attention. (*Id.* ¶ 57.) There, officers interrogated him and subjected him to a cavity search. (*Id.* ¶ 58.) Young was later booked into East Baton Rouge Parish Prison ("EBRPP"), where he received a second cavity search, despite never leaving law enforcement custody. (*Id.* ¶ 59.) Further, the officers at the BRAVE Cave would have known that he would be subjected to a search at EBRPP. (*Id.* ¶ 60.) Thus, according to the *SAC*, even if the arrest was lawful, at least one of the cavity searches was unnecessary and used only to harass, humiliate, and intimidate. (*Id.* ¶ 61.) Moreover, Young claims he suffered "uniquely egregious emotional damages by being taken to the BRAVE Cave, where he feared extrajudicial punishment for his alleged crimes." (*Id.* ¶ 62.)

---

[3] The *SAC* has two paragraphs 36 and 37, the second of which will be referred to by the Court as 36a and 37a.

To date, no prosecutorial body has brought any formal charges against Young regarding the 2018 arrest, and the time to do so has prescribed. (*Id.* ¶ 63.) Thus, the criminal prosecution has terminated in Young's favor. (*Id.*)

Young also claims to be the victim of a second incident involving BRPD officers and the BRAVE Cave. (*Id.* ¶¶ 63–80.) This incident occurred on August 4, 2023. (*Id.* ¶ 64.) But, as will be explained below, Officers Thornton and Norman were not involved in this incident, so it is not germane to the instant motions.

Young asserts a number of claims against the Officer Defendants. (*SAC* ¶¶ 183–229, Doc. 46.) First, in Count I, Plaintiff brings claims under 42 U.S.C. § 1983 for unreasonable search and seizure, excessive force, theft of property, and substantive due process violations. (*Id.* ¶¶ 183–98.) More specifically, Plaintiff claims the cavity searches on Young were unreasonable because (a) there was insufficient justification for initiating the searches; (b) the scope of the searches was unreasonable; (c) the place in which the searches were conducted was unreasonable; (d) the manner of the search was unreasonable; (e) the officers lacked reasonable suspicion or probable cause to search Young's anus; (f) there were no exigent circumstances to justify the searches; and (g) there was no exception to the warrant requirement. (*Id.* ¶¶ 189–90.) As to excessive force, Young claims the force used was excessive to the need with respect to the strikes to his face and body, the use of the taser when he was compliant, and Young's right to resist an unlawful arrest. (*Id.* ¶¶ 195–96.) Theft of property relates to Young's motorcycle being taken without compensation, and the substantive due process claim is based on Young's "repeated strip and visual body cavity searches and . . . imprisonment at an off-the-books torture black site . . . ." (*Id.* ¶¶ 197–98.)

In Count II, Plaintiff pleads a cause of action for retaliation under the First Amendment. (*Id.* ¶¶ 199–207.) Plaintiff claims that, in 2023, Defendants retaliated against Young by taking him

4

to the BRAVE Cave only after learning that he had filed a lawsuit against BRPD following his 2018 arrest. (*Id.* ¶ 205.)

Count III is a § 1983 conspiracy claim against the Officer Defendants. (*Id.* ¶¶ 208–09.) The *SAC* states: "Here, the yet-unidentified [O]fficer-Defendants entered into a conspiracy to use their state powers to deprive Plaintiffs of their civil rights when they worked together to arrest . . . Young and perform unnecessary battery and searches on . . . Young." (*Id.* ¶ 209.)

Count IV alleges a failure-to-intervene claim against all Officer Defendants. (*Id.* ¶¶ 210–12.) According to the *SAC*, "[t]he yet-unidentified [O]fficer-Defendants each observed their fellow officers violating Plaintiffs' constitutional rights, had a reasonable opportunity to intervene, and chose not to act." (*Id.* ¶ 212.)

Count V is a *Monell* claim against the City. (*Id.* ¶¶ 213–16.) This claim need not be discussed here.

The remaining counts involve state law claims. (*Id.* ¶¶ 217–29.) Count VI consists of violations of the Louisiana Constitution, false arrest, false imprisonment, assault and battery, negligence, negligent hiring, failure to train, and intentional infliction of emotional distress ("IIED"). (*Id.* ¶¶ 217–24.) Young makes these claims against all defendants. (*Id.*) Count VI is a state law conspiracy claim against all defendants, (*id.* ¶¶ 225–27), and Count VII is for vicarious liability against the City and Chief Morse, (*id.* ¶¶ 228–29).

Plaintiffs pray for compensatory, special, and punitive damages as well as an award of attorney's fees and costs. (*Id.* ¶ 231.)

## II.    RULE 12(B)(6) STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Hamilton v. Dallas Cnty.*,

79 F.4th 494, 499 (5th Cir. 2023) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007))). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Iqbal*, 556 U.S. at 678).

"To be plausible, the complaint's '[f]actual allegations must be enough to raise a right to relief above the speculative level.'" *In re Great Lakes Dredge & Dock Co.*, 624 F.3d 201, 210 (5th Cir. 2010) (quoting *Twombly*, 550 U.S. at 555). "In deciding whether the complaint states a valid claim for relief, we accept all well-pleaded facts as true and construe the complaint in the light most favorable to the plaintiff." *Id.* (citing *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008)). The Court does "not accept as true 'conclusory allegations, unwarranted factual inferences, or legal conclusions.'" *Id.* (quoting *Ferrer v. Chevron Corp.*, 484 F.3d 776, 780 (5th Cir. 2007)). "A claim for relief is implausible on its face when 'the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct.'" *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 796 (5th Cir. 2011) (citing *Iqbal*, 556 U.S. at 679).

The Court's "task, then, is 'to determine whether the plaintiff has stated a legally cognizable claim that is plausible, not to evaluate the plaintiff's likelihood of success.'" *Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 854 (5th Cir. 2012) (quoting *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010) (citing *Iqbal*, 556 U.S. at 678)). "[A] claim is plausible if it is supported by 'enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the alleged misconduct].'" *Calhoun v. City of Houston Police Dep't*, 855 F. App'x 917, 919–20 (5th Cir. 2021) (per curiam) (quoting *Twombly*, 550 U.S. at 556).

"In determining whether a plaintiff's claims survive a Rule 12(b)(6) motion to dismiss, the factual information to which the court addresses its inquiry is limited to (1) the facts set forth in the complaint, (2) documents attached to the complaint, and (3) matters of which judicial notice may be taken under Federal Rule of Evidence 201." *Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 900 (5th Cir. 2019) (citations omitted). "Although a 'court may also consider documents attached to either a motion to dismiss or an opposition to that motion when the documents are referred to in the pleadings and are central to a plaintiff's claims,' . . . the court need not do so." *Brackens v. Stericycle, Inc.*, 829 F. App'x 17, 23 (5th Cir. 2020) (per curiam) (quoting *Brand Coupon Network, L.L.C. v. Catalina Mktg. Corp.*, 748 F.3d 631, 635 (5th Cir. 2014)). *See also Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008) (using permissive language regarding a court's ability to rely on documents incorporated into the complaint by reference).

Particularly important here, "where video recordings are included in the pleadings, . . . the video depictions of events, viewed in the light most favorable to the plaintiff, should be adopted over the factual allegations in the complaint if the video 'blatantly contradict[s]' those allegations." *Harmon v. City of Arlington*, 16 F.4th 1159, 1163 (5th Cir. 2021) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). That is, the Court should adopt the video where, viewing the facts "in the light depicted by the videotape," the plaintiff's "version of events is so utterly discredited by the record that no reasonable jury could have believed him." *Scott*, 550 U.S. at 380–81.

### III. Discussion

#### A. Parties' Arguments

##### 1. *Norman's Original Brief (Doc. 77-1)*

Norman argues that he is entitled to qualified immunity. (Doc. 77-1 at 4.) Plaintiff has failed to allege which arrests and actions are attributable to which officers. (*Id.* at 5.) Norman clarifies that he was only involved in the 2018 arrest, and he attaches the probable cause affidavits from that arrest to support his position. (*Id.*)

Norman also attaches two bodycam footage videos which, according to him, show that the force used on Young by both officers was not excessive. Plaintiff "was tased only while fleeing, brought to the ground by Officer Norman and a second officer, repeatedly warned to stop resisting, was restrained with an objectively reasonable amount of force until he stopped resisting, and no tasing or further force was used following the handcuffs placed on his person." (*Id.* at 7–8.) Norman urges the Court to consider this footage and details its contents; according to Norman, the video shows Young escalating the encounter, attempting to flee, resisting, and biting the officers. (*Id.*) Plaintiff then attacks the factual allegations of the *SAC*, explaining that they still show Plaintiff attempting to flee and fighting the officers. (*Id.* at 9.) Norman cites caselaw supporting the idea that reasonable force is acceptable when an individual flees, attempts to flee, or poses a danger of running away. (*Id.* at 9–10 (citing *Hodge v. Engleman*, 90 F.4th 840, 846 (5th Cir. 2024); *McVae v. Perez*, 120 F.4th 487, 493–94 (5th Cir. 2024)).) The probable cause affidavit further shows that Young had a weapon on his person, which heightens the risk officers faced. (*Id.* at 10.) Thus, Plaintiff has no excessive force claim. (*Id.*)

Norman also claims qualified immunity to the remaining claims. (*Id.*) The state law excessive force and false arrest claims fail for the same reason as the federal claims. (*Id.*) Further,

the probable cause affidavits disprove the false arrest claim. (*Id.*) Lastly, Plaintiff fails to allege a single detail to support his other claims. (*Id.* at 10–11.)

Norman closes by arguing that the claims against him should be dismissed. (*Id.* at 11.) Alternatively, his motion for more definite statement should be granted. (*Id.*)

### 2. Thornton's Original Brief (Doc. 91-1)

Thornton admits he was present for the 2018 incident but not the 2023 one. (Doc. 91-1 at 2.) However, Thornton contends that there are no allegations against him directly, other than that he was a BRPD officer. (*Id.* at 3.) Young simply makes generic claims against "all defendants" without providing the requisite information. (*Id.*) "By failing to plead one single act on the part of Officer Thornton, [Young] failed to meet the Federal Rule 8(a)(2) pleading standard." (*Id.*) Thornton quotes a Fifth Circuit decision which dismissed a plaintiff's case for "fail[ing] to supply any specific allegations of wrongdoing against any specific Defendant." (*Id.* at 4 (quoting *Devis v. Mem'l Med. Ctr. of E. Tex.*, 129 F.3d 609 (5th Cir. 1997)).) "That is precisely the situation here, and the outcome should be the same, i.e., dismissal under Rule 12(b)(6)." (*Id.*)

Thornton also claims qualified immunity. (*Id.* at 4.) Thornton relies on the bodycam videos, arguing that they should be considered because still images from them are included in the *SAC* and because they are central to Young's claims. (*Id.* at 5.) Thornton then asserts that Young tried to flee, was physically resistant and disobedient, and only stopped trying to flee and being disobedient after seven-plus minutes of attempted flight. (*Id.* at 5–6.) Once Young was in handcuffs, no further force was applied or needed. (*Id.*)

Thornton moves in the alternative for a more definite statement. "As discussed above, without any allegations as to what Officer Thornton did that was unlawful and thus violated

[Young's] Civil Rights, [Young has] created just the vagueness and ambiguity that Rule 12(e) was designed to combat." (*Id.* at 6.)

### 3. *Young's Oppositions to Norman's and Thornton's Motions (Docs. 100, 101)*

Young's opposition to Thornton's brief largely echoes his opposition to Norman's, with a little less detail. (*Compare* Doc. 101, *with* Doc. 100.) Thus, the Court will focus on Young's opposition to Norman's brief, while recognizing that these arguments apply with equal force to Thornton's.

Young details in the factual background section how the identities of the Officer Defendants were not originally known to him. (Doc. 100 at 2–3.) Then, Young propounded discovery requests to the City for the identities of the officers involved in the arrests, and the City responded with arrest reports. (*Id.* at 3.) Still, despite the bodycam footage and bystander videos, Young "has not been able to identify which officers are which in the videos." (*Id.*)

Turning to the argument, Young asks the Court to consider not just the body cam footage but also his own video evidence, which was also referenced by screenshot in the *SAC* and which is central to his claims. (*Id*. at 4.) Thus, Young agrees with Norman that the Court should consider the videos. (*Id.* at 4–5.)

Young next argues that the Court should (1) deny the motion to dismiss or, (2) alternatively, allow limited discovery because (a) any lack of specific allegations is attributable to Defendants, and (b) the allegations pled are sufficient to overcome qualified immunity. (*Id.* at 5) Plaintiff says that his extensive facts concerning the 2018 and 2023 arrests, along with the screenshots, show that the Officer Defendants committed the acts alleged. (*Id.*) Though Young cannot identify which officer is which without discovery, surely the Officer Defendants can recognize themselves in the videos. (*Id.*)

Young also references an Incident Report produced by the City in discovery. (*Id.* at 7.) "In the narrative, Defendant Norman admits to several relevant facts, including that he deployed a TASER, [and] 'delivered multiple close fist punches to [Plaintiff's] face and chest area.'" (*Id.* (quoting Doc. 100-4 at 25).) Thus, Young says, he "can now reasonably conclude that . . . Norman is one of the officers depicted in his complaint[,]" though it is still not clear which of the officers is Norman because the report "describe[s] substantially identical actions. . . ." (*Id.* at 7–8.)

Young acknowledges that he cannot plead which defendant committed what act, but (1) the *SAC* alleges that "*all* Officer-Defendants who were present are at the very least liable as parties to the conspiracy and for failure to intervene," and (2) the videos show the Officer Defendants committing the violations. (*Id.* at 9.)

> [I]t is disingenuous for these defendants to claim that the operative pleading does not give the defendant fair notice of what the plaintiffs' claims are and the grounds upon which it rests, particularly with respect to which officers were involved, when (1) Plaintiffs expressly list many officer names, and (2) these defendants would certainly have access to that information.

(*Id.* (quoting *Snearl v. City of Port Allen*, No. 21-455, 2022 U.S. Dist. LEXIS 105470, at *35 (M.D. La. June 13, 2022) (cleaned up) (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002))).)

Young also argues that the force was excessive and contrary to clearly established law. (*Id.*) Each act of force must be analyzed separately, and "[w]hat is reasonable may also change throughout a single encounter." (*Id.* at 10.) Further, force can become excessive if used after a plaintiff is compliant or subdued. (*Id.*) Young says the videos contradict Norman's account; Young does not attempt to flee, and the officers continue to use force on him after he is subdued. (*Id.* at 10–11.) "Even if some discreet actions by each Officer-Defendant could be considered reasonable – or at least not clearly unlawful – several of the acts of force occurred after Plaintiff was subdued

and in compliance." (*Id.* at 11.) Thus, regardless of which officer did what, all the officers violated clearly established law, and "[t]he proper remedy (if not denial of the motion) would be to amend the complaint to further identify which officer committed which acts, if necessary." (*Id.*)

### 4. Norman's Reply (Doc. 106)

Norman opens by asserting that the bystander videos do not depict the beginning of the encounter, wherein Young turned on his motorcycle, tried to flee the officers, and resisted. (Doc. 106 at 1–2.) Norman then says that all of this, and having a loaded weapon in his possession, defeat his false arrest claim. (*Id.* at 3.) As to the excessive force claim, "the bystander video does not depict the series of events leading up to the officers attempting to subdue and handcuff Plaintiff Young on the ground, as well as the actions of Plaintiff Young while on the ground in refusing to allow the officers to control and handcuff him." (*Id.*) Even on the ground, Young tried to "escape from underneath the officers and yank his arms away." (*Id.* at 4.) Norman's actions must be viewed from the perspective of a reasonable officer on the scene, not with 20/20 hindsight, and his conduct showed "measured and ascending" responses. (*Id.*)

### B. Preliminary Note

The Court notes two issues at the outset. First, though these Officer Defendants have sought dismissal of each of Plaintiff's claims, Young has only responded with argument on the following claims: excessive force, conspiracy, and bystander liability. (*See* Doc. 100 at 9.) "The Fifth Circuit makes it clear that when a party does not address an issue in his brief to the district court, that failure constitutes a waiver on appeal." *JMCB, LLC v. Bd. of Com. & Indus.*, 336 F. Supp. 3d 620, 634 (M.D. La. 2018) (deGravelles, J.) (quoting *Magee v. Life Ins. Co. of N. Am.*, 261 F. Supp. 2d 738, 748 n.10 (S.D. Tex. 2003)). "By analogy, failure to brief an argument in the district court waives that argument in that court." *JMCB*, 336 F. Supp. 3d at 634 (quoting *Magee*, 261 F. Supp.

2d at 748 n.10); *see also Payton v. Town of Maringouin*, No. 18-563, 2021 WL 2544416, at *26 (M.D. La. June 21, 2021) (deGravelles, J.) (collecting authorities), *aff'd*, No. 21-30440, 2022 WL 3097846 (5th Cir. Aug. 3, 2022). Thus, the Court finds that all claims against Norman and Thornton are waived, except Young's claims for excessive force and conspiracy under federal and state law and for bystander liability under § 1983.

But, because the Court will grant Plaintiff leave to amend the *SAC* (for reasons given below), the Court will also afford Plaintiff an opportunity to adequately plead these claims. The Court finds this appropriate because Young has not previously amended the complaint in response to a ruling by this Court assessing the sufficiency of his claims and because it is a "wise judicial practice" to allow at least one final opportunity to plead adequate claims under such circumstances. *See Jordan v. Gautreaux*, 593 F. Supp. 3d 330, 373 (M.D. La. 2022) (deGravelles, J.) (quoting *Watkins v. Gautreaux*, 515 F. Supp. 3d 500, 519 (M.D. La. 2021) (deGravelles, J.) (citing *JMCB*, 336 F. Supp. 3d at 641–42)); *see also Murphy v. Bos. Sci. Corp.*, No. 18-31, 2018 WL 6046178, at *1 (M.D. La. Nov. 19, 2018) (deGravelles, J.) (reaching same result) (citing, *inter alia*, *JMCB*, 336 F. Supp. 3d at 642). If after that Young fails to cure any deficiencies identified by these Officer Defendants, the Court will deny further leave to amend.

Second, Young seeks limited discovery so that he can determine which Officer Defendant is responsible for what conduct. While the Court is sympathetic to Young's position, the Court is bound to apply Fifth Circuit precedent on qualified immunity and discovery: "One of the most salient benefits of qualified immunity is protection from pretrial discovery, which is costly, time-consuming, and intrusive." *Zapata v. Melson*, 750 F.3d 481, 484–85 (5th Cir. 2014) (quoting *Backe v. LeBlanc*, 691 F.3d 645, 648 (5th Cir. 2012)). "Consequently, the [Fifth Circuit] has established a careful procedure under which a district court may defer its qualified immunity ruling if further

factual development is necessary to ascertain the availability of that defense." *Id.* at 485 (quoting *Backe*, 691 F.3d at 648). "[A] district court must first find 'that the plaintiff['s] pleadings assert facts which, if true, would overcome the defense of qualified immunity.'" *Id.* (quoting *Wicks v. Miss. State Emp. Servs.*, 41 F.3d 991, 994 (5th Cir. 1995)). "Thus, a plaintiff seeking to overcome qualified immunity must plead specific facts that both allow the court to draw the reasonable inference that the defendant is liable for the harm he has alleged and that defeat a qualified immunity defense with equal specificity." *Id.* (quoting *Backe*, 691 F.3d at 648). "After the district court finds a plaintiff has so pleaded, if the court remains 'unable to rule on the immunity defense without further clarification of the facts,' it may issue a discovery order 'narrowly tailored to uncover only those facts needed to rule on the immunity claim.'" *Id.* (quoting *Lion Boulos v. Wilson*, 834 F.2d 504, 507–08 (5th Cir. 1987)). The Court now turns to whether Young has met that initial burden.

### C.  Qualified Immunity Generally

"Qualified immunity shields government officials performing discretionary functions from civil damages liability 'as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated.'" *Crittindon v. LeBlanc*, 37 F.4th 177, 185 (5th Cir. 2022) (quoting *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)). "Determining whether an officer is entitled to qualified immunity requires a two-step inquiry." *Id.* "First, we ask whether the officer's alleged conduct has violated a federal right. Second, we ask whether the right in question was clearly established at the time of the alleged violation, such that the officer was on notice of the unlawfulness of his or her conduct." *Id.* at 185–86 (cleaned up). Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity

analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

### D.  Excessive Force

#### 1.  Did Norman and Thornton Commit a Constitutional Violation?

##### a.  Applicable Law

As to the first prong of qualified immunity, "[w]here, as here, the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment, which guarantees citizens the right 'to be secure in their persons . . . against unreasonable . . . seizures' of the person." *Graham v. Connor*, 490 U.S. 386, 394 (1989). "To prevail on an excessive force claim, a plaintiff must establish: '(1) injury[,] (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable.'" *Freeman v. Gore*, 483 F.3d 404, 416 (5th Cir. 2007) (Dennis, J.) (quoting *Tarver v. City of Edna*, 410 F.3d 745, 751 (5th Cir. 2005)).

"Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (cleaned up). "Excessive force claims are necessarily fact-intensive; whether the force used is 'excessive' or 'unreasonable' depends on 'the facts and circumstances of each particular case.'" *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (quoting *Graham*, 490 U.S. at 396) (citing *Brosseau v. Haugen*, 543 U.S. 194, 201 (2004) (observing that "this area is one in which the result depends very much on the facts of each case")). "Factors to consider include 'the severity of the crime at issue, whether the suspect poses an

immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Id.* (quoting *Graham*, 490 U.S. at 396). "[T]he question is 'whether the totality of the circumstances justifie[s] a particular sort of . . . seizure.'" *Graham*, 490 U.S. at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)).

"As in other Fourth Amendment contexts . . . , the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397 (citations omitted). "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Id.*

Additionally, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396 (citing *Terry v. Ohio*, 392 U.S. 1, 20–22 (1968)). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Id.* (cleaned up). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97.

Nevertheless, "a constitutional violation occurs when an officer tases, strikes, or violently slams an arrestee who is not actively resisting arrest," and Fifth Circuit "case law makes clear that when an arrestee is not actively resisting arrest the degree of force an officer can employ is reduced." *Darden v. City of Fort Worth*, 880 F.3d 722, 731 (5th Cir. 2018) (citations omitted). For example, in *Bush v. Strain*, 513 F.3d 492 (5th Cir. 2008), the appellate court found that "it was

objectively unreasonable for an officer to slam an arrestee's face into a vehicle when the arrestee 'was not resisting arrest or attempting to flee.'" *Darden*, 880 F.3d at 731 (quoting *Bush*, 513 F.3d at 502). "Similarly, in [*Newman v. Guedry*, 703 F.3d 757 (5th Cir. 2012)], [the Fifth Circuit] found that it was objectively unreasonable for officers to tase and strike an arrestee with a nightstick without resorting to less violent means when the arrestee's 'behavior did not rise to the level of active resistance.'" *Id.* (internal quotation marks omitted) (quoting *Newman*, 703 F.3d at 763). Thus, "[t]he law was clearly established at the time of the deputies' conduct that, once a suspect has been handcuffed and subdued, and is no longer resisting, an officer's subsequent use of force is excessive." *Carroll v. Ellington*, 800 F.3d 154, 177 (5th Cir. 2015) (citations omitted). "This includes repeated applications of a Taser after a suspect is arrested, subdued, and no longer resisting arrest." *Id.* (cleaned up).

But, the Fifth Circuit has also "repeatedly refused to hold that '*any* application of force to a compliant arrestee is *per se* unreasonable." *Salazar v. Molina*, 37 F.4th 278, 282 (5th Cir. 2022) (citing, *inter alia*, *Escobar v. Montee*, 895 F.3d 387, 394–95 (5th Cir. 2018) (quotation omitted)). This circuit has explained:

> *Escobar* is instructive. There, an officer allowed his police dog to bite a suspect for a full minute—even after the suspect, "in an attempt to convey his surrender," "dropped his knife and la[id] flat on the ground 'like a parachute man.'" 895 F.3d at 390–91. We still granted the officer qualified immunity. That's because, despite the apparent surrender, other circumstances indicated the suspect might still be a threat. These included: (1) the suspect had committed a felony; (2) he had sought to evade police for 20 minutes; (3) it was nighttime; (4) the suspect had a knife within reach, even though he had dropped it; and (5) the officer had been warned that the suspect was dangerous. *See id.* at 394–95; *see also Crenshaw v. Lister*, 556 F.3d 1283, 1293 (11th Cir. 2009) (per curiam) (determining in similar circumstances that "[e]ven assuming, as we must, that Crenshaw was legitimately attempting to surrender, it was objectively reasonable for Lister to question the sincerity of Crenshaw's attempt to do so" because Crenshaw "up to that point,

had shown anything but an intention of surrendering").

> As *Escobar* illustrates, a suspect cannot refuse to surrender and
> instead lead police on a dangerous hot pursuit—and then turn
> around, appear to surrender, and receive the same Fourth
> Amendment protection from intermediate force he would have
> received had he promptly surrendered in the first place. Like
> *Escobar*, this case involves a fleeing felony suspect who eventually
> decided to surrender and was then temporarily subjected to
> intermediate force.

*Id.* at 282–83. "[T]he relevant inquiry is whether—despite the *appearance* of unambiguous surrender—'an officer [would] have reason to doubt the suspect's compliance and still perceive a threat.'" *Id.* at 283 (quoting *Escobar*, 895 F.3d at 395).

And while it is true that "'an exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased,' . . . the relevant 'justification for the use of force' is the officer's reasonable perception of a threat of harm." *Id.* (quoting *Lytle v. Bexar Cnty.*, 560 F.3d 404, 413–14 (5th Cir. 2009)). "And this does *not* always require that a suspect be actively resisting, fleeing, or attacking an officer at the precise moment force is used." *Id.* (citing *Lytle*, 560 F.3d at 414) ("noting that it's reasonable to use defensive force where insufficient time has elapsed 'for the officer to perceive new information indicating the threat was past' (quotation omitted)"). "Instead, the relevant inquiry is whether the officer used a justifiable level of force in light of the continuing threat of harm that a reasonable officer could perceive." *Id.*

Thus, in *Salazar*, the Fifth Circuit found that the second *Graham* factor favored the deputy, even though he couldn't see a weapon nearby and even though he had not been warned that the plaintiff was dangerous before the incident. *Id.* at 283–84. The Fifth Circuit noted (1) that cartel activity was near the scene; (2) that there was "the presence of bystanders," and (3) that "the force deployed here was substantially less than that used in *Escobar*—a 10-second tasing before

18

handcuffing rather than 60 seconds of dog biting that continued until the suspect was fully handcuffed." *Id.* But, *Salazar* also involved a "high-speed chase through a residential neighborhood." *Id.* at 280.

Conversely, in *Joseph v. Bartlett*, 981 F.3d 319 (5th Cir. 2020), the *Graham* factors weighed in favor of the plaintiff because (1) it was undisputed that he had not committed a crime; (2) he presented no immediate threat to officer safety in that the officers knew he was unarmed and had in fact "assumed a fetal, or defensive, position;" and (3) plaintiff did not try to flee or resist arrest, "at least not actively," as he "did not attempt to strike any officer," "made no contact with any officer," and "was not struggling against the officers at all for substantial portions of the encounter." *Id.* at 333–34 (cleaned up). The officers also "failed to employ measured and ascending actions by "immediately resort[ing] to force, without any attempt to de-escalate the volatile situation" or "negotiate," "despite their knowledge that [Joseph] was mentally disturbed." *Id.* at 334.

> Force must be reduced once a suspect has been subdued. [*See, e.g.*, *Cooper v. Brown*, 844 F.3d 517, 524 (5th Cir. 2016); *Carroll*, 800 F.3d at 178.] Notably, "subdued" does not mean "handcuffed." If the suspect lacks any means of evading custody—for example, by being pinned to the ground by multiple police officers—force is not justified. [*See Cooper*, 844 F.3d at 524 (finding excessive force when officer did not release his police dog's bite until after handcuffing the suspect because the suspect was unarmed, in a trash bin, and physically unable to evade custody); *Ramirez v. Martinez*, 716 F.3d 369, 378 (5th Cir. 2013) (finding that tasing was excessive force when a suspect pulled his arm away before the officer had finished handcuffing him).] So even if Joseph failed to comply and struggled against the officers at certain points throughout the encounter, that resistance did not justify force indefinitely.
>
> * * *
>
> Viewing the facts in the light most favorable to Plaintiffs, we agree with the district court's weighing of factors. We hold that, if a jury found those facts to be true, Officers Martin and Costa violated

> Joseph's right to be free from excessive force during a seizure by failing to employ a measured and ascending response to the threat Joseph posed. Though Joseph was not suspected of committing any crime, was in the fetal position, and was not actively resisting, Officers Martin and Costa inflicted twenty-six blunt-force injuries on Joseph and tased him twice, all while he pleaded for help and reiterated that he was not armed. Officers Martin and Costa are not entitled to summary judgment on the constitutional merits.

*Id.* at 335.

"Yet another consideration bearing upon the reasonableness of an arresting officer's use of force is whether it involved measured and ascending responses to a suspect's noncompliance." *Buehler v. Dear*, 27 F.4th 969, 984 (5th Cir. 2022) (cleaned up). Thus, in *Buehler*, the Court explained that an officer was entitled to qualified immunity when the plaintiff "relentlessly followed around officers for hours, disobeying their repeated and unambiguous commands that he step back at least arm's length away so as not to block the Officers' field of vision." *Id*. at 984–85.

### b.  Analysis

Having carefully considered the matter, the Court finds that there are questions of fact precluding dismissal of Young's excessive force claims. That is, construing the evidence in a light most favorable to Young and drawing reasonable inferences in his favor, a reasonable jury could conclude that a majority of the *Graham* factors weigh in his favor.

First, Young was stopped for a relatively minor crime—possession of a marijuana blunt. In fact, this crime is so minor that, as the *SAC* explains, there is a Baton Rouge ordinance which prohibits officers from taking a person into custody if he is suspected of possessing a small amount of marijuana. (*SAC* ¶ 33, Doc. 46 (quoting Baton Rouge Code of Ord. § 13.966(d).) Rather, the suspect must promise to appear or deposit his driver's license. (*Id.*) Thus, the first *Graham* factor—the severity of the crime at issue—weighs in Young's favor.

Second, there are questions of fact on the next *Graham* factor—"whether the suspect poses an immediate threat to the safety of the officers or others." On the one hand, the incident report narrative—which Young himself attaches to his opposition and which Young relies upon—reflects (1) that Young "repeatedly attempted to reach into the waist band during the ordeal" and (2) that, when Young was searched after the encounter incident to his arrest, Young was found with a ".40 cal. Semi-Automatic Pistol near [his] waist band." (Doc. 100-4 at 19.) This certainly supports Norman and Thornton's position.

But a reasonable jury could look at the evidence and reach different conclusions. At no point in any of the videos does Young reach for his waist band or for a weapon, even during the initial encounter when he is taken to the ground and then tries to flee. Moreover, even if Young had a weapon, none of the videos show the officers expressing any concern or knowledge that Young was armed. Construing the evidence in a light most favorable to Young, with reasonable inferences drawn in his favor, a reasonable jury could conclude that this factor weighs in his favor.

Third, reasonable minds could differ on whether Young was a flight risk, at least throughout the entire encounter. As the officers approached him, Young was on a motorcycle, and the bodycam footage does reflect some engine noise as the officers surround him. (Def_A2_691.mp4 at 0:38–0:45.) But the video is inconclusive as to whether that was an effort by Young to flee, and a reasonable jury could conclude that it was not. At the very least, the Court cannot say that the video "blatantly contradicts" the allegations of the *SAC* that the officers tackled Young to the ground, even though he did not provoke them and even though he was in no position to flee. *See Harmon*, 16 F.4th at 1163; *SAC* ¶¶ 34–35, Doc. 46.

Further, after the officers took Young to the ground from his motorcycle, Young got to his feet, tried to flee, and was only stopped when the officers tased him. (Def_A2_691.mp4 at 0:45–

1:11.) However, for the remaining seven minutes of the encounter, Young was pinned to the ground and unable to leave. At this point, he was no longer a flight risk. Thus, for large portions of the encounter, Young was not able to flee, much less actively trying to do so.

Similarly, a reasonable factfinder could easily conclude that Young was not actively resisting throughout the entire encounter. Even if Young initially resisted the officers after he was tackled and tased, (*id.* at 0:38–1:30), different minds could reach different conclusions about whether he continued to actively resist for the remainder of the encounter, (Def_A1_465.mp4 at 01:30–9:29). While Young struggled with his hands and tried to keep the officers from being able to handcuff him, (*id.* at 0:01–3:22), at one point the bodycam is placed on the ground and it is difficult if not impossible to see what was happening, (*id.* at 3:22–5:28). At another point while the officers have Young pinned on the ground, he is heard saying something like, "I tried to turn around, and you punched me," indicating that Young tried to comply with the officers and yet was still subjected to force. (*Id.* at 5:23–5:27.) Again, at the very least, none of the videos "blatantly contradict" the *SAC*'s allegations that Young was compliant and not resisting. *See Harmon*, 16 F.4th at 1163; *SAC* ¶ 41, Doc. 46.

The civilian bystander videos (Pls. Exs. A, B, and C) reinforce the Court's conclusion. Construing these clips in a light most favorable to Young, with reasonable inferences drawn in his favor, a jury could easily conclude that Young was struck multiple times despite offering little, if any, resistance. Indeed, the very fact that the civilians viewing the incident made several comments about how unreasonably and unfairly the officers acted underscores the conclusion that reasonable minds could view this incident in Young's favor.

The Court finds this case closer to *Joseph* than *Salazar* and *Escobar*. Unlike *Escobar*, (1) Young was not stopped because of a felony; (2) Young did not try to evade the police for 20

minutes; (3) it was not nighttime; and (4) the officers were not warned that Young was dangerous. *See Salazar*, 37 F.4th at 282–83 (citing *Escobar*, 895 F.3d at 394–95). Unlike *Salazar*, (1) there was no reports of cartel activity near the scene; (2) Young never "led police on a high-speed chase through a residential neighborhood"; and (3) the multiple head strikes by the officers after he was pinned to the ground for seven minutes are closer in quality and duration to an impermissible 60 seconds of dog biting than a justified 10-second tasing. *Id.* at 280, 283–84 (citing *Cooper*, 844 F.3d at 521 (denying qualified immunity where an officer subjected a DUI suspect who had previously fled on foot to more than a full minute of dog biting)).

Rather, like *Joseph*, Young did not resist, "at least not actively," as he "did not attempt to strike any officer," "made no contact with any officer," and "was not struggling against the officers at all for substantial portions of the encounter." 981 F.3d at 333–34 (cleaned up). The officers also immediately resorted to force with the initial takedown and tasering, and a reasonable jury could conclude from the bystander videos that they failed to employ measured and ascending actions and failed to de-escalate the situation. *See id.* at 334. Critically, "'subdued' does not mean 'handcuffed.' If the suspect lacks any means of evading custody—for example, by being pinned to the ground by multiple police officers—force is not justified." *Id.* at 335. "So even if [Young] failed to comply and struggled against the officers at certain points throughout the encounter, that resistance did not justify force indefinitely." *See id.*

At the very least, the Court cannot dismiss Young's claims based on the current record before the Court. In sum, the Court finds that Young has plausibly pled a constitutional violation at this stage.

## 2. *Was the Law Clearly Established?*

"[T]o overcome qualified immunity, the plaintiff's version of those disputed facts must also constitute a violation of clearly established law. This requires the plaintiff to 'identify a case'—usually, a 'body of relevant case law'—in which 'an officer acting under similar circumstances . . . was held to have violated the [Constitution].'" *Joseph*, 981 F.3d at 330 (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 64 (2018)). "In determining what constitutes clearly established law, [the Fifth Circuit] first looks to Supreme Court precedent and then to [its] own." *Crittindon*, 37 F.4th at 186 (quoting *Shumpert v. City of Tupelo*, 905 F.3d 310, 320 (5th Cir. 2018)). "When there is no direct controlling authority, [the Fifth Circuit] may rely on decisions from other circuits to the extent that they constitute a robust consensus of cases of persuasive authority." *Id.* (cleaned up) (quoting *Shumpert*, 905 F.3d at 320).

"Ultimately, the touchstone is 'fair warning': The law can be clearly established 'despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights.'" *Id.* (quoting *Shumpert*, 905 F.3d at 321 (quoting *Hope v. Pelzer*, 536 U.S. 730, 740 (2002))).

Nevertheless, "[t]o be clearly established, a right must be 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Garcia v. Blevins*, 957 F.3d 596, 600 (5th Cir. 2020) (quoting *Mullenix v. Luna*, 577 U.S. 7 (2015) (per curiam)). Courts "do not require plaintiffs to identify a case 'directly on point,' but the case law must 'place[ ] the statutory or constitutional question *beyond debate*.'" *Id.* at 600–01 (quoting *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

24

Thus, Young "must also demonstrate that the law was 'clearly established'—that, as of [October 24, 2018], the date of their encounter with [Young], any reasonable officer would have known that [Norman and Thornton's] behavior was unlawful." *Joseph*, 981 F.3d at 336 (quoting *Saucier v. Katz*, 533 U.S. 194, 199 (2001), *overruled on other grounds by*, *Pearson*, 555 U.S. 223). "Existing precedent must squarely govern the specific facts at issue, such that only someone who is plainly incompetent or who knowingly violates the law would have behaved as the official did." *Id.* at 337 (cleaned up). "Because this specificity is especially important in the Fourth Amendment context, the Supreme Court has stressed the need to identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment." *Id.* (cleaned up).

Having carefully considered the matter, the Court finds that Young has satisfied this prong of the qualified immunity analysis. The Court bases this decision on *Joseph* and the authorities cited in that case.

*Joseph* found that the law was clearly established, partly because of *Ramirez*. *Id.* at 339–40. The Fifth Circuit explained:

> In *Ramirez v. Martinez*, construing the disputed facts in the plaintiff's favor, we found that officers exerted force in violation of the Fourth Amendment by immediately tasing and forcing to the ground a person whose only resistance was merely failing to comply with orders to put his hands behind his back, and pulling his arm away when an officer grabbed his hand. [716 F.3d at 378.] We concluded that he posed so little threat that tasing him before he was handcuffed was excessive; tasing him after he was "handcuffed and subdued while lying face down on the ground" was even more so. [*Id.* at 379.]
>
> In this case, Plaintiffs' view of the facts shows that Joseph resisted, at most, passively, by disobeying similar orders and pulling away from the officers. Plus, the district court concluded that, at points, he was not resisting at all, meaning that, at points, he was subdued and *no* force was justified. Yet, Officer Martin immediately applied significant physical force by pinning him down, tasing him, and jabbing him with a baton, and Officers Martin and Costa continued

> applying force by punching and kicking him, even while he was subdued and not resisting. While the officers maintain that Joseph was resisting, the video does not preclude the possibility that he wasn't. Construing all facts and inferences in the light most favorable to Plaintiffs, Joseph remained on the ground, in the fetal position, resisting intermittently and passively, if at all.

*Id.*

The same reasoning applies here. Considering the facts in a light most favorable to Young, with reasonable inferences drawn in his favor, he "resisted, at most, passively, by disobeying similar orders and pulling away from the officers," and reasonable persons could conclude (as the civilian bystanders did) that, "at points, he was not resisting at all, meaning that, at points, he was subdued and *no* force was justified." *See id.* Despite this, one of the officers struck Young several times in the head. Likewise, "[w]hile the officers maintain that [Young] was resisting, the video[s] do[ ] not preclude the possibility that he wasn't." *See id.* Thus, these principles were clearly established on the day of the incident. *Id.* at 341–42; *see also id.* at 325–26 (stating that the events of *Joseph* occurred in February 2017); *SAC* ¶ 29, Doc. 46 (stating that Norman and Thornton's encounter with Young occurred in October 2018).

Additionally, *Joseph* relied on *Cooper*, which is also relevant to the instant analysis.

> [I]n *Cooper v. Brown*, [the Fifth Circuit] concluded that an officer inflicted excessive force by declining to release his police dog's bite until after he had handcuffed the suspect. [844 F.3d at 526.] . . . The pertinent fact in *Cooper* is that the officer encountered the suspect cornered, in a small "cubbyhole" for storing trash bins. This location, combined with the dog physically keeping him from going anywhere, left the suspect with no meaningful way to evade police custody. [*Id.* (citing *Campbell v. City of Springboro*, 700 F.3d 779, 789 (6th Cir. 2012)).]

> Similarly, here, Joseph was cornered behind the counter and would have had to get past as many as a dozen police officers in order to leave the store. As in *Cooper*, Joseph was unarmed and the officers had no indication that he was. Yet, viewing the evidence in the light most favorable to Plaintiffs, Officers Martin and Costa "increased

the force applied at the same time the threat presented by [the suspect] decreased" by the presence of additional officers in the store and Joseph's waning resistance.

*Id.* at 340.

Similarly, in this case, Young had "no meaningful way to evade police custody" once the officers had him pinned on the ground for several minutes. *See id.* Moreover, while Young proved to be armed, there is a dispute as to whether he gave any "indication that he was." *See id.*

Finally, *Joseph* also relied on *Darden*, which "announced no new rule" but "reaffirmed an already-existing one," namely that "[o]fficers engage in excessive force when they physically strike a suspect who is not resisting arrest." *Id.* at 342. As in *Darden*, "a jury could ultimately determine that the suspect was in fact resisting arrest or disobeying commands[,] [a]nd under those alternative facts, the officers' force may have been reasonable under the Fourth Amendment and reasonable under the clearly established law." *Id.* (citing *Darden*, 880 F.3d at 731–32). "Yet, a genuine dispute of material fact existed, meaning that a jury could also find facts demonstrating the opposite," and that meant that the officers were not entitled to qualified immunity at the summary judgment stage. *Id.* (citing *Darden*, 880 F.3d at 731–32).

The same reasoning applies here. While Thornton and Norman may ultimately prevail at trial, at this stage, based on the record currently before the Court, Young has successfully overcome qualified immunity as to these officers.

### 3. Discovery

As stated earlier, in order to obtain discovery, Young must first plead sufficient facts to overcome both parts of the qualified immunity analysis, and only then can the Court order narrowly-tailored discovery necessary to "uncover only those facts needed to rule on the immunity claim." *Zapata*, 750 F.3d at 484–85. The Court finds that he has done so. As a result, the Court

will allow limited discovery on the narrow issue of which officer was responsible for what conduct during the 2018 incident. Plaintiff shall have sixty (60) days to conduct this discovery, and he shall have twenty-eight (28) days thereafter in which to amend the *SAC* to clarify his allegations. Thereafter, Thornton and Norman may file new motions to dismiss, but they should be mindful of the instant ruling and not advance arguments which this Court has found to be lacking in merit.

### E. Bystander Liability

"The law as of 2006 was clearly established that 'an officer who is present at the scene and does not take reasonable measures to protect a suspect from another officer's use of excessive force may be liable under section 1983.'" *Carroll*, 800 F.3d at 177 (quoting *Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995)). "To establish this claim, the Carrolls must show that Sims '(1) kn[ew] that a fellow officer [was] violating an individual's constitutional rights; (2) ha[d] a reasonable opportunity to prevent the harm; and (3) cho[se] not to act." *Id.* (quoting *Kitchen v. Dallas Cnty.*, 759 F.3d 468, 480 (5th Cir. 2014)).

Here, the bystander videos show one of the officers punching Young five to six times over a span ranging from ten seconds to a minute. (Pl. Ex. A at 2:40–3:40; Pl. Ex. C at 0:29–0:40.) As already stated, there are numerous questions of fact about the extent to which Young was struck after he was subdued and compliant and about whether a constitutional violation occurred. When construing the evidence in a light most favorable to Young, a reasonable jury could easily conclude that the other officer (who was not punching Young) knew that this was occurring, had a reasonable opportunity to prevent further strikes after the initial one, and yet chose not to act.

As a result, the Court finds that Plaintiff has pled sufficient facts to overcome qualified immunity. The Court will allow limited discovery, outlined above, on the narrow question of which

officer committed the excessive force, and which officer could have prevented that constitutional violation.

### F. Section 1983 Conspiracy Claim

#### 1. Applicable Law

"In order to prevail on a section 1983 conspiracy claim, a plaintiff must establish (1) the existence of a conspiracy involving state action and (2) a deprivation of civil rights in furtherance of the conspiracy by a party to the conspiracy." *Pfannstiel v. City of Marion*, 918 F.2d 1178, 1187 (5th Cir. 1990), *overruled in part on other grounds by*, *Duckett v. City of Cedar Park*, 950 F.2d 272 (5th Cir. 1992); *see also Jabary v. City of Allen*, 547 F. App'x 600, 610 (5th Cir. 2013) ("To prove a conspiracy under § 1983, a plaintiff must allege facts that indicate (1) there was an agreement among individuals to commit a deprivation, and (2) that an actual deprivation occurred." (citing *Cinel v. Connick*, 15 F.3d 1338, 1343 (5th Cir. 1994))).

Regarding the first element: "To establish a cause of action based on conspiracy a plaintiff must show that the defendants agreed to commit an illegal act." *Arsenaux v. Roberts*, 726 F.2d 1022, 1024 (5th Cir. 1982). "Mere conclusory allegations of conspiracy cannot, absent reference to material facts, survive a motion to dismiss." *Id.* (citing *Slotnick v. Staviskey*, 560 F.2d 31, 33 (1st Cir. 1977)). "[M]ore than a blanket of accusation is necessary to support a § 1983 claim." *Id.* (citations omitted). Plaintiffs must make "specific allegation[s] of facts tending to show a prior agreement has been made." *Id.* at 1023–24.

As to the second element, "[a] conspiracy may be charged under section 1983 as the legal mechanism through which to impose liability on all of the defendants without regard to who committed the particular act, but 'a conspiracy claim is not actionable without an actual violation of section 1983.'" *Hale*, 45 F.3d at 920 (quoting *Pfannstiel*, 918 F.2d at 1187). For example, "in a

case alleging both Fourth Amendment violations and a § 1983 conspiracy, the proper order of review is *first* whether Plaintiffs' have alleged a constitutional violation that is objectively unreasonable in light of clearly established Fourth Amendment law, and *only if that is the case* should the court then consider whether Plaintiffs have alleged a conspiracy." *Morrow v. Washington*, 672 F. App'x 351, 355 (5th Cir. 2016) (emphasis in original).

### 2. Analysis

Having carefully considered the matter, the Court finds that Young failed to adequately allege a conspiracy. As established above, Young sufficiently pled that Thornton and Norman committed the constitutional violations of excessive force and bystander liability. However, there are sparse allegations that these officers formed a prior agreement to commit those violations. *See Arsenaux*, 726 F.2d at 1023–24. In fact, the only real facts pled on this point are in Paragraph 209: "Here, the yet-unidentified [O]fficer-Defendants entered into a conspiracy to use their state powers to deprive Plaintiffs of their civil rights when they worked together to arrest . . . Young and perform unnecessary battery and searches on . . . Young." (*SAC* ¶ 209, Doc. 46.) Because "[m]ere conclusory allegations of conspiracy cannot, absent reference to material facts, survive a motion to dismiss," *Arsenaux*, 726 F.2d at 1024 (citation omitted), Plaintiff's conspiracy claim must fall.

### G. State Law Claims

The Court need not give an extensive analysis of the state law claims; rather, they largely rise and fall to the same extent as their corresponding federal claims. *See Imani v. City of Baton Rouge*, 614 F. Supp. 3d 306, 381 (M.D. La. 2022) (deGravelles, J.) (denying motion for summary judgment on plaintiffs' assault and battery claims "largely for the same reasons the federal excessive force claims survive"); *Snow Ingredients, Inc. v. SnoWizard, Inc.*, 833 F.3d 512, 526 (5th Cir. 2016) (explaining that, to establish a conspiracy claim under La. Civ. Code art. 2324, "the

plaintiff is required to establish a meeting of the minds or collusion between the parties for the purpose of committing wrongdoing" (cleaned up)). Thus, the Court will grant these defendant's motion with respect to the civil conspiracy claim but deny it with respect to the assault and battery claims.

IV.    CONCLUSION

Accordingly,

**IT IS ORDERED** that the *Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) and in the Alternative, Motion for a More Definite Statement Pursuant to Fed. R. Civ. P. 12(e)* (Doc. 77) filed by Defendant Ronald Norman, Jr. and the *Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6), and in the Alternative, Motion for a More Definite Statement Pursuant to Fed. R. Civ. P. 12(e)* (Doc. 91) filed by Defendant Frederick Thornton, Jr. are **GRANTED IN PART** and **DENIED WITHOUT PREJUDICE IN PART**. The motion is **GRANTED** in that all claims by Young against these defendants are dismissed except those for (a) excessive force in violation of the Fourth Amendment; (b) bystander liability under § 1983; and (c) assault and battery under Louisiana state law. As to these surviving claims, the motion is **DENIED WITHOUT PREJUDICE**. The Court will allow Young limited discovery over a period of sixty (60) days on the narrow issue of which defendant was responsible for what specific conduct.

**IT IS FURTHER ORDERED** that Young shall have twenty-eight (28) days from the end of the discovery period in which to amend the *SAC*, clarify his allegations, and cure the deficiencies detailed in this opinion. Failure to do so will result in the dismissal of these claims with prejudice.

Signed in Baton Rouge, Louisiana, on <u>February 25, 2026</u>.

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**