UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

STEVEN W. YOUNG, ET AL.

VERSUS

CITY OF BATON ROUGE, ET AL.

CIVIL ACTION

NO. 19-886-JWD-SDJ

## RULING AND ORDER

This civil rights action is brought by two individuals for claims arising from two incidents, years apart, involving officers with the Baton Rouge Police Department ("BRPD") and the BRPD's "BRAVE Cave." (*Second Amended Complaint* ("*SAC*") ¶¶ 1–8, Doc. 46.) Plaintiffs are Steven W. Young and Latrice Robinson (collectively, "Plaintiffs"), (*id.* ¶¶ 11–12), though the *SAC* applies only to Young's claims, (*id.* at 1 n.1).[1] Defendants include: (1) the City of Baton Rouge (the "City"); (2) Chief Thomas Morse, Jr.; (3) six BRPD officers, including Ronald Norman, Jr., Frederick Thornton, Jr., Brett Usey, David Kennedy, Joseph Carboni, and James Thomas, Jr., (collectively, the "Officer Defendants"); (4) Doe Officers 1–20; and (5) ABC Insurance Companies 1–10 (all are, collectively, "Defendants"). (*Id.* ¶¶ 13–22.)

Currently before the Court are four motions to dismiss filed under Rule 12 of the Federal Rules of Civil Procedure by four Officer Defendants—Thomas, (Doc. 67), Carboni, (Doc. 74), Usey, (Doc. 71), and Kennedy, (Doc. 76).[2] Young opposes the motions, (Docs. 94, 97, 99, 98, respectively), and each Officer Defendant other than Carboni has filed a reply, (Docs. 103, 104, 105). Oral argument is not necessary. The Court has carefully considered the law, the allegations

---

[1] The *SAC* specifically states: "Plaintiff Latrice Robinson remains a plaintiff in this matter, but with separate counsel. Her facts are outlined in the original complaint and incorporated into this Amended Complaint for consistency, although this pleading is only for Plaintiff Young." (*SAC*, Doc. 46 at 1 n.1.)
[2] The motions involving the other Officer Defendants, (Docs. 77, 91), have been taken up in a separate ruling, (Doc. 121).

1

of the *SAC*, the videos in the record referenced in and central to that pleading (which the parties agree should be considered), and the arguments and submissions of the parties and is prepared to rule.

For the following reasons, the Court will grant the motions in part and deny them in part. Specifically, Usey's motion will be granted in full, except in two respects. First, Young's negligence claim survives, and the motion is denied in that respect. Second, Usey seeks dismissal of Young's claims for theft of property and his official capacity claims, but Young clarifies that he is not asserting these claims against Usey. As to those, Usey's motion is denied as moot.

Thomas, Carboni, and Kennedy's motions will be granted in full, except with respect to Young's claims for excessive force, assault, battery, and negligence. On these claims, the Court will allow limited discovery on the narrow issue of which Officer Defendant tased Young a second time. Following that discovery, the Court will allow Young leave to amend the *SAC* a final time to clarify his allegations and cure the deficiencies outlined in this ruling.

## I.    RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

### A.    The 2018 Incident

The following allegations are taken from Plaintiff's *SAC*. On October 24, 2018, Young and Robinson were talking outside of the apartment complex where they resided on Bard Avenue. (*SAC* ¶ 29, Doc. 46.) Young was sitting on his motorcycle while they talked. (*Id.* ¶ 30.)

At about 2:52 p.m., two officers from the BRPD Street Crimes Unit pulled up next to the Plaintiffs in their patrol unit. (*Id.* ¶ 31.) The two officers immediately accused Young of possessing a marijuana blunt, which Young denied. (*Id*. ¶ 32.)

The *SAC* quotes a Baton Rouge ordinance which prohibits officers from taking a person into custody if they are suspected of possessing a small amount of marijuana. (*Id.* ¶ 33 (quoting

Baton Rouge Code of Ord. § 13.966(d)).) Rather, the suspect must promise to appear or deposit his driver's license. (*Id.*)

Despite this ordinance, officers tackled Young to the ground, even though he did not provoke them and even though he was in no position to flee. (*Id.* ¶¶ 34–35.) The officers deployed a TASER on Young and pinned him on the ground. (*Id.* ¶ 36.) While Young was pinned, one officer violently dragged him, and another punched him in the face, bouncing his head off the pavement. (*Id.* ¶ 37.) A bystander captured this incident on video while filming from her apartment complex. (*Id.* ¶ 38.)

Next, the officers handcuffed Young. (*Id.* ¶ 39.) They kneeled on top of him for several minutes. (*Id.*) This too was captured on video by bystanders, and still images of this video are incorporated into the *SAC*. (*Id.*; Figs. 2, 3, 4.)

The officers punched Young in the face several more times while he was handcuffed and pinned on the ground. (*Id.* ¶ 40.) The video shows that Young was compliant and not resisting. (*Id.* ¶ 41.) After several minutes, more BRPD officers arrived, completed the arrest, and loaded Young into a vehicle. (*Id.* ¶ 36a.)[3]

Afterward, Young was not immediately taken to the hospital or for processing. (*Id.* ¶ 37a.) Instead, he was taken to the "BRAVE Cave," where he was subjected to an unnecessary cavity search. (*Id.* ¶ 42.)

The "BRAVE Cave" is a warehouse near Plank Road, now known to have been a "black site" for BRPD officers to interrogate and torture suspects. (*Id.* ¶ 43.) BRAVE is an acronym for "Baton Rouge Area Violence Elimination." (*Id.* ¶ 44.) The BRAVE team was BRPD's "Street Crimes" unit or "Violent Crime Enforcement Unit." (*Id.* ¶ 45.) The *SAC* goes on to provide details

---

[3] The *SAC* has two paragraphs 36 and 37, the second of which will be referred to by the Court as 36a and 37a.

about the history of the BRAVE team, most of which are more relevant to the claims against the City than to the instant motions. (*See id.* ¶¶ 46–56.)

Young was taken to the BRAVE Cave immediately after his arrest, before getting medical attention. (*Id.* ¶ 57.) There, officers interrogated him and subjected him to a cavity search. (*Id.* ¶ 58.) Young was later booked into East Baton Rouge Parish Prison ("EBRPP"), where he received a second cavity search, despite never leaving law enforcement custody. (*Id.* ¶ 59.) Further, the officers at the BRAVE Cave would have known that he would be subjected to a search at EBRPP. (*Id.* ¶ 60.) Thus, according to the *SAC*, even if the arrest was lawful, at least one of the cavity searches was unnecessary and used only to harass, humiliate, and intimidate. (*Id.* ¶ 61.) Moreover, Young claims he suffered "uniquely egregious emotional damages by being taken to the BRAVE Cave, where he feared extrajudicial punishment for his alleged crimes." (*Id.* ¶ 62.)

To date, no prosecutorial body has brought any formal charges against Young regarding the 2018 arrest, and the time to do so has prescribed. (*Id.* ¶ 63.) Thus, the criminal prosecution has terminated in Young's favor. (*Id.*)

### B. The 2023 Incident

Young also claims to be the victim of a second incident involving BRPD officers and the BRAVE Cave. (*SAC* ¶¶ 64–80, Doc. 46.) This incident occurred on August 4, 2023, (*id.* ¶ 64), and lies at the heart of the instant motions.

On that day, Young was riding his motorcycle when another BRPD unit activated its sirens. (*Id.* ¶ 64.) This unit was the same make and model as in the 2018 arrest. (*Id.*) Young feared another beating, so he abandoned the motorcycle and ran into a back yard. (*Id.* ¶ 65.)

BRPD officers engaged Young as one slammed him to the ground, kneeled on his back, and shouted "I'm going to f---ing beat the f--- out of you" with a raised fist. (*Id.* ¶ 66.) The officer

who was on Young's back then struck Young in the head several times. (*Id.* ¶ 67.) Another deployed a TASER for several seconds. (*Id.*)

The officers then handcuffed Young and told him to roll over. (*Id.* ¶ 68.) Young complied. (*Id.*) They told him not to "ball up." (*Id.* ¶ 69.) Young complied. (*Id.*) They told him not to put his legs out. (*Id.* ¶ 70.) Young complied. (*Id.*)

Despite his compliance and the handcuffs on Young, one officer deployed a TASER a second time. (*Id.* ¶ 71.) Young feared that the officers were going to kill him. (*Id.* ¶ 72.) Because of excessive TASER use, Young lost the ability to use his legs or to stand up or walk. (*Id.* ¶ 73.) He told the officers his legs felt "like spaghetti." (*Id.*)

The bodycam footage shows the officers discussing how they suspected that Young was riding a stolen motorcycle. (*Id.* ¶ 74.) That was the impetus for the pursuit. (*Id.*) But Young owned the motorcycle. (*Id.*)

Young was detained in a BRPD vehicle. (*Id.* ¶ 75.) The officers then discussed getting him medical assistance for his injuries. (*Id.*)

But Young identified himself and told them that he had a case pending for a 2018 assault. (*Id.* ¶ 76.) Then, one of the officers started laughing and said, "I know who you are." (*Id.*) The officer then cut off the audio on his body-worn camera. (*Id.*) The officers are next seen on camera having a discussion, though there is no audio. (*Id.* ¶ 77.)

After that discussion, Young was again taken to the BRAVE Cave and again subjected to a humiliating cavity search. (*Id.* ¶¶ 78–79.) This was "despite the policy that he would be searched upon being processed into EBRPP." (*Id.* ¶ 79.)

Young spent approximately 60 days incarcerated for resisting an officer, aggravated flight, and exceeding the speed limit. (*Id.* ¶ 80.) No steps have been taken in that prosecution. (*Id.*)

### C.  Young's Claims

Young asserts a number of claims against the Officer Defendants. (*SAC* ¶¶ 183–229, Doc. 46.) First, in Count I, Plaintiff brings claims under 42 U.S.C. § 1983 for unreasonable search and seizure, excessive force, theft of property, and substantive due process violations. (*Id.* ¶¶ 183–98.) More specifically, Plaintiff claims the cavity searches were unreasonable because (a) there was insufficient justification for initiating the searches; (b) the scope of the searches was unreasonable; (c) the place in which the search was conducted was unreasonable; (d) the manner of the searches was unreasonable; (e) the officers lacked reasonable suspicion or probable cause to search Young's anus; (f) there were no exigent circumstances to justify the searches; and (g) there was no exception to the warrant requirement. (*Id.*¶¶ 189–90.) As to excessive force, Young claims the force used was excessive to the need with respect to the strikes to his face and body, the use of the TASER when he was compliant, and Young's right to resist an unlawful arrest. (*Id.* ¶¶ 195–96.) Theft of property relates to Young's motorcycle being taken without compensation, and the substantive due process claim is based on Young's "repeated strip and visual body cavity searches and . . . imprisonment at an off-the-books torture black site . . . ." (*Id.* ¶¶ 197–98.)

In Count II, Plaintiff pleads a cause of action for retaliation under the First Amendment. (*Id.* ¶¶ 199–207.) Plaintiff claims that, in 2023, Defendants retaliated against Young by taking him to the BRAVE Cave only after learning that he had filed a lawsuit against BRPD following his 2018 arrest. (*Id.* ¶ 205.)

Count III is a § 1983 conspiracy claim against the Officer Defendants. (*Id.* ¶¶ 208–09.) The *SAC* states: "Here, the yet-unidentified [O]fficer-Defendants entered into a conspiracy to use their state powers to deprive Plaintiffs of their civil rights when they worked together to arrest . . . Young and perform unnecessary battery and searches on . . . Young." (*Id.* ¶ 209.)

Count IV alleges a failure-to-intervene claim against all Officer Defendants. (*Id.* ¶¶ 210–12.) According to the *SAC*, "[t]he yet-unidentified officer-Defendants each observed their fellow officers violating Plaintiffs' constitutional rights, had a reasonable opportunity to intervene, and chose not to act." (*Id.* ¶ 212.)

Count V is a *Monell* claim against the City. (*Id.* ¶¶ 213–16.) This claim need not be discussed here.

The remaining counts involve state law claims. (*Id.* ¶¶ 217–29.) Count VI consists of violations of the Louisiana Constitution, false arrest, false imprisonment, assault and battery, negligence, negligent hiring, failure to train, and intentional infliction of emotional distress ("IIED"). (*Id.* ¶¶ 217–24.) Young makes these claims against all Defendants. (*Id.*) Count VI-a is state law conspiracy claim against all Defendants, (*id.* ¶¶ 225–27),[4] and Count VII is for vicarious liability against the City and Chief Morse, (*id.* ¶¶ 228–29.)

Plaintiffs pray for compensatory, special, and punitive damages as well as an award of attorney's fees and costs. (*Id.* ¶¶ 230–31.)

## II.    RULE 12(B)(6) STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Hamilton v. Dallas Cnty.*, 79 F.4th 494, 499 (5th Cir. 2023) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007))). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Iqbal*, 556 U.S. at 678).

---

[4] The *SAC* has two Count VI's, the second of which will be referred to by the Court as VI-a.

"To be plausible, the complaint's '[f]actual allegations must be enough to raise a right to relief above the speculative level.'" *In re Great Lakes Dredge & Dock Co.*, 624 F.3d 201, 210 (5th Cir. 2010) (quoting *Twombly*, 550 U.S. at 555). "In deciding whether the complaint states a valid claim for relief, we accept all well-pleaded facts as true and construe the complaint in the light most favorable to the plaintiff." *Id.* (citing *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008)). The Court does "not accept as true 'conclusory allegations, unwarranted factual inferences, or legal conclusions.'" *Id.* (quoting *Ferrer v. Chevron Corp.*, 484 F.3d 776, 780 (5th Cir. 2007)). "A claim for relief is implausible on its face when 'the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct.'" *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 796 (5th Cir. 2011) (citing *Iqbal*, 556 U.S. at 679).

The Court's "task, then, is 'to determine whether the plaintiff has stated a legally cognizable claim that is plausible, not to evaluate the plaintiff's likelihood of success.'" *Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 854 (5th Cir. 2012) (quoting *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010) (citing *Iqbal*, 556 U.S. at 678)). "[A] claim is plausible if it is supported by 'enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the alleged misconduct].'" *Calhoun v. City of Houston Police Dep't*, 855 F. App'x 917, 919–20 (5th Cir. 2021) (per curiam) (quoting *Twombly*, 550 U.S. at 556).

"In determining whether a plaintiff's claims survive a Rule 12(b)(6) motion to dismiss, the factual information to which the court addresses its inquiry is limited to (1) the facts set forth in the complaint, (2) documents attached to the complaint, and (3) matters of which judicial notice may be taken under Federal Rule of Evidence 201." *Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 900 (5th Cir. 2019) (citations omitted). "Although a 'court may also consider

documents attached to either a motion to dismiss or an opposition to that motion when the documents are referred to in the pleadings and are central to a plaintiff's claims,' . . . the court need not do so." *Brackens v. Stericycle, Inc.*, 829 F. App'x 17, 23 (5th Cir. 2020) (per curiam) (quoting *Brand Coupon Network, L.L.C. v. Catalina Mktg. Corp.*, 748 F.3d 631, 635 (5th Cir. 2014)); *see also Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008) (using permissive language regarding a court's ability to rely on documents incorporated into the complaint by reference).

Particularly important here, "where video recordings are included in the pleadings, . . . the video depictions of events, viewed in the light most favorable to the plaintiff, should be adopted over the factual allegations in the complaint if the video 'blatantly contradict[s]' those allegations." *Harmon v. City of Arlington*, 16 F.4th 1159, 1163 (5th Cir. 2021) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). That is, the Court should adopt the video where, viewing the facts "in the light depicted by the videotape," the plaintiff's "version of events is so utterly discredited by the record that no reasonable jury could have believed him." *Scott*, 550 U.S. at 380–81.

## III.  DISCUSSION: USEY'S MOTION (DOC. 71)

### A.  Preliminary Issues

#### 1.  *Parties' Arguments*

##### a.  Usey's Original Brief (Doc. 71-1)

Usey provides the most extensive arguments for dismissal, so the Court will focus on his brief first. (*See* Doc. 71-1.) Usey begins by asserting that the Court should consider the bodycam footage of the incident but then states that, even if the Court did not, the Court should still dismiss the claims based on the *SAC*. (*Id.* at 5–6.)

Usey then argues that the *SAC* makes no specific claims against Usey. (*Id.* at 7.) On this basis alone, the *SAC* should be dismissed. (*Id.*) At the very least, the Court should dismiss those claims against Usey arising from the 2018 arrest, as Usey was not involved in that incident and "did not even work in the Street Crimes Unit at that time." (*Id.*) While that's not dispositive, the *SAC* is silent about his involvement in this incident, and he is not shown on the video. (*Id.* at 7–8.)

Next, Usey contends that, to the extent the *SAC* makes claims against Usey in his official capacity, such claims should be dismissed. (*Id.* at 8.) Any such claims would be duplicative of those made against the City. (*Id.*)

Later, Usey maintains that the theft of property claim fails because Young provides only one sentence about it in the *SAC*. (*Id.* at 18.) This is insufficient to support a basis of liability. (*Id.*)

### b. Young's Opposition (Doc. 99)

Young makes a few preliminary arguments as well. (Doc. 99 at 4–6.) Young first says that he asserts no official capacity claim or theft of property claim against Usey. (*Id.* at 4, 15.) Thus, there are no such claims to dismiss. (*Id.*) Young then goes on to say that the Court should consider the bodycam footage. (*Id.* at 4–5.)

Next, Young contends that, to the extent it is unclear which allegations are made against which officers, the Court should grant Young leave to amend to clarify, as discovery has recently revealed Usey's participation in what happened. (*Id.* at 5–10.) Young then goes through the allegations in the *SAC* and asserts that, while it is unclear which specific defendant committed what specific act, "*all* Officer-Defendants who were present are at the very least liable as parties to the conspiracy and for failure to intervene." (*Id.* at 9.)

> [I]t is disingenuous for these defendants to claim that the operative pleading does not give the defendant fair notice of what the plaintiffs' claims are and the grounds upon which it rests, particularly with respect to which officers were involved, when (1)

Plaintiffs expressly list many officer names, and (2) these defendants would certainly have access to that information.

(*Id.* at 10 (citation omitted).) Further, Usey has now for the first time identified himself in the videos, so the proper remedy is to allow Young to amend his complaint, if necessary. (*Id.*)

### c. Usey's Reply (Doc. 103)

In reply, Usey begins by noting that the Affidavit of Probable Cause was filed into the public record at the 19th Judicial District Court on August 9, 2023, and the City attached the document to its motion to dismiss in October 2024. (Doc. 103 at 1–2.) Young should have known from both documents that Usey was involved in the 2023 arrest, so his explanation for failing to make specific allegations against Usey is inadequate and requires dismissal. (*Id.*) Similarly, Usey does not concede that he was involved in the BRAVE Cave search, and the *SAC* does not specify that he was. (*Id.* at 2.) While his role in the "arrest and scuffle" is clear from the bodycam videos, "any alleged role he played in the search is not." (*Id.* at 2.) Several claims—including the claims for conspiracy, failure to intervene, and IIED—are based exclusively on the search, yet (a) Young fails to allege Usey participated in that search, and (b) Young's opposition shows that he cannot so allege. (*Id.* at 2–3.) Because Usey has invoked qualified immunity, Young must plead specific facts to overcome that defense. (*Id.* at 3.) Though Young had the relevant information before filing the *SAC*, he failed to plead specific facts, so the Court should not allow limited discovery. (*Id.* at 3–4.) Finally, Usey notes that Young does not oppose dismissal of the official capacity and theft of property claims, so they should be dismissed. (*Id.* at 7.)

### 2. Law and Analysis

At the outset, the parties agree on two issues. First, because the bodycam footage is referenced in the complaint and central to its claims, the Court may consider that video. But, as stated above, "where video recordings are included in the pleadings, as is the case here, the video

depictions of events, viewed in the light most favorable to the plaintiff, should be adopted over the factual allegations in the complaint if the video 'blatantly contradict[s]' those allegations." *Harmon*, 16 F.4th at 1163 (quoting *Scott*, 550 U.S. at 380).

Second, Young concedes that there are no theft of property or official capacity claims made against Usey. (Doc. 99 at 4, 15.) To the extent Usey seeks dismissal of those claims, his motion is denied as moot.

The parties disagree, however, about the extent to which Young should be able to obtain discovery or amend his complaint. As to the latter, while Usey complains that Young could have done better, the Court will nevertheless afford Plaintiff an opportunity to adequately plead his claims. The Court finds this appropriate because Young has not previously amended the complaint in response to a ruling by this Court assessing the sufficiency of his claims and because it is a "wise judicial practice" to allow at least one final opportunity to plead adequate claims under such circumstances. *See Jordan v. Gautreaux*, 593 F. Supp. 3d 330, 373 (M.D. La. 2022) (deGravelles, J.) (quoting *Watkins v. Gautreaux*, 515 F. Supp. 3d 500, 519 (M.D. La. 2021) (deGravelles, J.) (citing *JMCB, LLC v. Bd. of Com. & Indus.*, 336 F. Supp. 3d 620, 641–42 (M.D. La. 2018) (deGravelles, J.))); *see also Murphy v. Bos. Sci. Corp.*, No. 18-31, 2018 WL 6046178, at *1 (M.D. La. Nov. 19, 2018) (deGravelles, J.) (reaching same result) (citing, *inter alia*, *JMCB*, 336 F. Supp. 3d at 642). If after that Young fails to cure any deficiencies identified by Usey or the other Officer Defendants, the Court will deny further leave to amend.

As to discovery, Young seeks limited discovery so that he can determine which Officer Defendant is responsible for what conduct. While the Court is sympathetic to Young's position, the Court is bound to apply Fifth Circuit precedent on qualified immunity and discovery: "One of the most salient benefits of qualified immunity is protection from pretrial discovery, which is

costly, time-consuming, and intrusive." *Zapata v. Melson*, 750 F.3d 481, 484–85 (5th Cir. 2014)

(quoting *Backe v. LeBlanc*, 691 F.3d 645, 648 (5th Cir. 2012)). "Consequently, [the Fifth Circuit]

has established a careful procedure under which a district court may defer its qualified immunity

ruling if further factual development is necessary to ascertain the availability of that defense." *Id.*

at 485 (quoting *Backe*, 691 F.3d at 648). "[A] district court must first find 'that the plaintiff['s]

pleadings assert facts which, if true, would overcome the defense of qualified immunity.'" *Id.*

(quoting *Wicks v. Miss. State Emp. Servs.*, 41 F.3d 991, 994 (5th Cir. 1995)). "Thus, a plaintiff

seeking to overcome qualified immunity must plead specific facts that both allow the court to draw

the reasonable inference that the defendant is liable for the harm he has alleged and that defeat a

qualified immunity defense with equal specificity." *Id.* (quoting *Backe*, 691 F.3d at 648). "After

the district court finds a plaintiff has so pleaded, if the court remains 'unable to rule on the

immunity defense without further clarification of the facts,' it may issue a discovery order

'narrowly tailored to uncover only those facts needed to rule on the immunity claim.'" *Id*. (quoting

*Lion Boulos v. Wilson*, 834 F.2d 504, 507–08 (5th Cir. 1987)). The Court now turns to whether

Young has met that initial burden.

### B.  Qualified Immunity Generally

"Qualified immunity shields government officials performing discretionary functions from

civil damages liability 'as long as their actions could reasonably have been thought consistent with

the rights they are alleged to have violated.'" *Crittindon v. LeBlanc*, 37 F.4th 177, 185 (5th Cir.

2022) (quoting *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)). "Determining whether an

officer is entitled to qualified immunity requires a two-step inquiry." *Id.* "First, we ask whether

the officer's alleged conduct has violated a federal right. Second, we ask whether the right in

question was clearly established at the time of the alleged violation, such that the officer was on

notice of the unlawfulness of his or her conduct." *Id.* at 185–86 (cleaned up). Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

### C.  Search and Seizure

#### 1.  Parties' Arguments

Usey contends that the unreasonable search and seizure claim should be dismissed. (Doc. 71-1 at 8.) The search was conducted pursuant to a lawful arrest, and the video confirms as much. (*Id.* at 9.) Moreover, Young was found with drug paraphernalia and a Schedule II substance, so there was ample reason to believe that he possessed contraband. (*Id.* at 10.) The fact that the strip search occurred in a private location also supports the reasonableness of the search. (*Id.* at 11.) At the very least, Usey is entitled to qualified immunity. (*Id.* at 12.)

Young disputes Usey's arguments about the unlawful search and seizure. (Doc. 99 at 10.) Young notes that Usey does not deny being at the BRAVE Cave but rather argues the search was reasonable because Young had contraband, so there was probable cause. (*Id.* at 10–11.) But that is not the standard—rather, "[v]isual body cavity searches must be justified by specific articulable facts supporting reasonable suspicion that an arrestee is secreting contraband inside the body cavity to be searched." (*Id.* at 11 (citing *Sloley v. VanBramer*, 945 F.3d 30, 33 (2d Cir. 2019); *Salinas v. Breier*, 695 F.2d 1073 (7th Cir. 1982); *McKinley v. Trattles*, 732 F.2d 1320 (7th Cir. 1984); *Hunter v. Auger*, 672 F.2d 668, 674 (8th Cir. 1982); *Fuller v. M.G. Jewelry*, 950 F.2d 1437 (9th Cir. 1991)).) Usey offers no facts which would support his believing that Young had contraband in a body cavity, much less probable cause. (*Id.* at 11–12.) Moreover, Usey argues the BRAVE Cave search was appropriate because of the need for privacy and the need to quickly seize evidence and

prevent its destruction, but "Defendants have not articulated any reason why there would be such a risk and there was no risk as it is not disputed that Plaintiff was handcuffed and secured in Defendants' custody, having already been transported across town without issue." (*Id.* at 12.) The BRAVE Cave was particularly unreasonable and inappropriate because Young alleges that it was used for intimidation and deterrence. (*Id.*) Finally, again, Young was already in custody, and he would have been searched at EBRPP, so the true purpose of the search was intimidation. (*Id.* at 12–13.)

Usey replies that the search was not unreasonable in light of clearly established law. (Doc. 103 at 4.) Usey disputes the cases Plaintiff relies upon; while Usey acknowledges that he needed reason to believe Young was "hiding weapons or contraband," officers had such reasons, as Young was found with drugs and a crack pipe and acted suspiciously and resisted arrest. (*Id.* at 5 (quoting *United States v. Gilbert*, 252 F. App'x 692, 693 (5th Cir. 2007) (citations omitted))). Further, Young led the Officer Defendants on a lengthy chase, during which he had time to conceal drugs in his body cavities. (*Id.*) Usey then cites cases from this circuit supporting the conclusion that the strip search was constitutional. (*Id.* at 6 (citing *Williams v. Kaufman Cnty.*, 86 F. Supp. 2d 586, 596 (N.D. Tex. 2000), *aff'd*, 352 F.3d 994 (5th Cir. 2003); *United States v. Williams*, 823 F. App'x 267, 268 (5th Cir. 2020) (per curiam); *Carter v. Anderson*, No. 02-0005, 2004 WL 2208488, at *6 (N.D. Tex. Sept. 30, 2004)).)

> Plaintiff has failed to address these authorities and has not cited a single case from within the Fifth Circuit on this issue. Certainly, he has not shown that it was "clearly established" in the Fifth Circuit as of August 4, 2023 that the foregoing set of facts was not sufficient to justify a strip search. Therefore, his claims based on the search should be dismissed.

(*Id.* at 6.)

### 2.    *Law and Analysis*

Having carefully considered the matter, the Court will grant Usey's motion. In sum, the Court finds that Usey is entitled to qualified immunity for the strip search. However, the Court will allow Plaintiff leave to amend and will emphasize that, while defendants may be entitled to qualified immunity for the first strip search, they may not be entitled to qualified immunity for a second, if it occurred.

Both sides acknowledge that "[t]he law was clearly established . . . that strip searching individuals, about whom the police had no individualized probable cause of weapon or drug possession, was unlawful." *Williams v. Kaufman Cnty.*, 352 F.3d 994, 1007 (5th Cir. 2003); *see also Varnado v. Carboni*, No. 24-133, 2025 WL 3284488, at *6 (M.D. La. Nov. 25, 2025) (Dick, C.J.) ("The law was clearly established at the time of this incident that a warrant or probable cause was needed to perform a strip search." (citing *Lee v. Lawrence*, No. 23-1229, 2024 WL 3385644, at *10–11 (M.D. La. July 12, 2024) (citing *Sims v. City of New Orleans*, No. 03-3169, 2005 WL 1400440, at *14 (E.D. La. June 6, 2005) (concluding that Supreme Court and Fifth Circuit precedents deem strip searches without probable cause to be unlawful)))). But, that only partially answers the question of Usey's liability.

"Clearly established law is determined by controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity." *Tucker v. City of Shreveport*, 998 F.3d 165, 173 (5th Cir. 2021) (quoting *Clarkston v. White*, 943 F.3d 988, 993 (5th Cir. 2019)). "With qualified immunity, the Supreme Court has repeatedly instructed that clearly established law is *not* to be defined at a high level of generality. This is particularly true in recent years." *Id.* (citing *City of Escondido v. Emmons*, 586 U.S. 38, 42–44 (2019); *Kisela v. Hughes*, 584 U.S. 100, 103–06 (2018); *Mullenix v. Luna*, 577 U.S. 7, 12–

16

14 (2015)). "For conduct to be objectively unreasonable in light of clearly established law, there need not be a case directly on point, but 'existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* at 173–74 (citing *White v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam) (internal quotation marks omitted); *Mullenix*, 577 U.S. at 12).

"[S]pecificity is especially important in the Fourth Amendment context, where the [Supreme] Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." *Id.* (quoting *Kisela*, 584 U.S. at 104 (quoting *Mullenix*, 577 U.S. at 12)); *see also S.O. v. Hinds Cnty. Sch. Dist.*, No. 17-383, 2019 WL 13295538, at *3 (S.D. Miss. Aug. 30, 2019) (applying in context of search at school); *Carpenter v. Webre*, No. 17-808, 2018 WL 1453201, at *11 (E.D. La. Mar. 23, 2018) (recognizing same in context of seizure). "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." *Carpenter*, 2018 WL 1453201, at *11 (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). "Instead, the dispositive question is whether 'in light of the specific context of the case, not as a broad general proposition,' the right was clearly established . . . ." *Id.* (quoting *Mullenix*, 577 U.S. at 12).

In short, "[w]hen properly applied, [qualified immunity] protects all but the plainly incompetent or those who knowingly violate the law." *Tucker*, 998 F.3d at 174 (citing *Saucier v. Katz*, 533 U.S. 194, 202 (2001), *overruled on other grounds by*, *Pearson*, 555 U.S. 223 (internal quotation marks omitted)). "Consequently, '[q]ualified immunity is justified unless *no* reasonable officer could have acted as [the defendant officers] did here, or *every* reasonable officer faced with the same facts would not have [acted as the defendant officers did]." *Id.* (quoting *Mason v. Faul*, 929 F.3d 762, 764 (5th Cir. 2019) (citing *District of Columbia v. Wesby*, 583 U.S. 48, 63–64 (2018)

("The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. Otherwise, the rule is not one that 'every reasonable official' would know.")))

Here, the video in evidence shows that police caught Young trying to hop a fence and flee the officers. (Def_C1_995.mp4 at 0:41–0:48.) He resisted being handcuffed, which led to one officer tasing him. (*Id.* at 0:45–1:30.) He was found with drug paraphernalia (a crackpipe) on his person. (*Id.* at 7:35–7:38.) Officers also found what appears to be drugs, which they pour into a small bag with the crackpipe. (Def_C2_650.mp4 at 8:10–8:30.) Further, Young acted strangely throughout the encounter—possibly, as Young said, from fear of the police and because he was tased, but possibly, from the police's perspective, from suspected criminal activity. (Def_C1_995.mp4 at 30:00–31:31 (Young not allowing paramedic to assist him and the paramedic responding, "You have to cooperate with us. There is literally nothing I can do for you when you're screaming and not letting me see.").) Considering the video, and even assuming Usey participated in the strip search—which is not at all clear from the allegations of the *SAC* or the video—the Court cannot say that all officers would know, beyond debate, that strip searching Young *once* under these circumstances was unlawful; at the very least, this case presents a close call about which reasonable minds could differ.

Neither side cites binding authority to support their position, but Usey cites two cases within this circuit that support his position. In *Williams*, a criminal defendant appealed the denial of his motion to suppress, arguing that "evidence of drugs found on her person during her post-arrest strip search should have been suppressed because there was not cause to stop her, detain her, or take her to the jail to be strip searched." 823 F. App'x at 267–68. Officers subjected defendant to a traffic stop after observing her drift between two lanes and change lanes without a signal. *Id.*

at 268. "Furthermore, testimony and body-camera recordings from the traffic stop demonstrate that [one officer] observed that [defendant] had red eyes, asserted multiple times she had not been drinking, and was argumentative and 'squirrely' during the pat-down search." *Id.* The Fifth Circuit found that the initial stop was justified and that the officer could have reasonably suspected that the traffic offenses were "related to drug or alcohol use, which justified extending the length of the detention." *Id.* "Because the traffic stop and arrest did not violate [defendant's] Fourth Amendment rights, the district court did not err by denying her pretrial motions." *Id.*

Likewise, in *Carter*, the district court found that the plaintiff "fail[ed] to demonstrate that the strip search in a private room, by male officers, after disclosing his previous drug-related charges and current charge for public intoxication, prior to being placed in a jail cell was unreasonable." 2004 WL 2208488, at *6 (citing *Watt v. City of Richardson Police Dep't*, 849 F.2d 195, 197–98 (5th Cir. 1988) ("Reasonableness under the fourth amendment must afford police the right to strip search arrestees whose offenses posed the very threat of violence by weapons or contraband drugs that they must curtail in prisons.")). The district court also highlighted the following undisputed facts: (a) plaintiff's residence was a "known place of illegal narcotics activity"; (b) plaintiff "consumed alcoholic beverages during the evening prior to his early morning arrest"; and (c) plaintiff "smelled of alcohol and his eyes were bloodshot and glassy." *Id.*

"[U]npublished opinions cannot themselves establish binding law for this circuit. While they can still serve as 'persuasive authority,' we must look elsewhere to determine whether the legal rule . . . was clearly established." *Ramirez v. Killian*, 113 F.4th 415, 426–27 (5th Cir. 2024) (cleaned up).

"[I]n the absence of directly controlling authority, a consensus of cases of persuasive authority might, under some circumstances, be sufficient to compel the conclusion that no

19

reasonable officer could have believed that his or her actions were lawful." *Id.* (quoting *McClendon v. City of Columbia*, 305 F.3d 314, 329 (5th Cir. 2002) (en banc) (internal quotation marks omitted)). "Where no directly controlling authority applies, 'we look to the law of other jurisdictions in assessing whether a reasonable [official] would have known . . . that his conduct was unlawful.'" *Id.* (internal quotation marks omitted) (quoting *Morgan v. Swanson*, 659 F.3d 359, 372 n.26 (5th Cir. 2011) (en banc) (Benavides, J.) (quoting *McClendon*, 305 F.3d at 329)) (citing, *inter alia*, *Crittindon*, 37 F.4th at 186 ("When there is no direct controlling authority, 'this [C]ourt may rely on decisions from other circuits to the extent that they constitute a robust consensus of cases of persuasive authority.'" (alteration in original) (quoting *Shumpert v. City of Tupelo*, 905 F.3d 310, 320 (5th Cir. 2018)))).

While Plaintiff identifies a number of circuit court cases, the Court finds that each of these is distinguishable, or at least not sufficiently on point to constitute a "robust consensus of cases of persuasive authority." *Crittindon*, 37 F.4th at 186 (citation omitted). In *Sloley*, the Second Circuit reversed the district court's finding of reasonable suspicion because there was a question of fact as to whether the officer recovered any crack cocaine from plaintiff's car, which was "central to the existence of the requisite reasonable suspicion and the availability of qualified immunity." 945 F.3d at 44. The Court specifically noted that there was no evidence that the plaintiff "was fidgeting or moved about suspiciously" or that drugs were retrieved from inside his pants. *Id.* at 46.

Likewise, in *Hunter v. Auger*, the Eighth Circuit "enjoin[ed] the further application of [an] Iowa correctional policy that permits the strip search of a visitor on the basis of the unwarranted suspicion arising from a completely uncorroborated anonymous tip containing nothing more than an assertion of drug smuggling activity." 672 F.2d at 676. This is clearly different than the instant case.

20

In *Fuller*, the Ninth Circuit found that "the rationale underlying [prior precedent]—which only allow[ed] strip searches of detainees with less than probable cause where the objective is to discover weapons or contraband—[did] not apply to" that case and that the court would not "extend the reasonable suspicion standard to body cavity searches for ordinary stolen property." 950 F.2d at 1448. In looking at qualified immunity, the Court noted that "the case law at the time the searches took place suggested that a reasonable suspicion by the officer that the Fullers were harboring a stolen ring was not enough to justify visual body cavity searches where there was no evidence that the object sought posed any threat to jail security." *Id.* at 1451. Still, the Court affirmed the granting of qualified immunity because the panel did "not believe that reasonable police officer would have necessarily understood at the time she conducted the body cavity searches of the Fullers that the searches violated the Fullers' Fourth Amendment rights." *Id.*

In *McKinley*, the Seventh Circuit affirmed a jury's finding that a prison official acted unreasonably and maliciously in conducting two strip searches in violation of prison regulations. 732 F.2d at 1324–25. "To find liability, the jury was required by the instructions to find that Hammer violated the strictures of the regulations on strip searches. The evidence, as found by the district court, supported an inference that Hammer acted in intentional disregard of the regulations." *Id.* at 1325. Again, this case, in the prison setting and after a trial on the merits, is markedly different than the instant one.

In *Salinas*, police performed cavity searches on a mother and her four minor children after their car was stopped because of a federal bench warrant on the father. 695 F.2d at 1075–76. The Seventh Circuit reversed the district court and found, under the unique facts of the case, that the chief of police was not liable for the constitutional violations.[5] *Id.* at 1084–85.

---

[5] The *Salinas* court explained:

In sum, each of these cases is factually distinguishable from the instant case. Given these differences, and given the unique factual circumstances of this case (specifically, Young's flight from officers before his arrest, his being found with drugs and drug paraphernalia on his person, and his strange behavior for an extended period of time after the arrest), the Court cannot say that it was clearly established that the Officer Defendants violated the law in conducting a strip search on Young.

The Court also notes that Young has cited only four circuit decisions in support of his position. Conversely, in *Ramirez*, the Fifth Circuit recognized a robust consensus when "[e]ach of our sister circuits save for the Eleventh Circuit has addressed, in published opinions, the applicability of the Fourth Amendment to state officials' killing pet dogs"; when "[e]ight of those opinions were published before" the events of the suit; and when "[t]he legal rule that they announce[d] [wa]s clear: killing a pet dog constitutes a seizure of property under the Fourth Amendment, which must then be evaluated for reasonableness to determine whether the killing ran afoul of the Constitution." 113 F.4th at 427. *Ramirez* itself "acknowledge[d] that it is difficult

---

[T]he policy statement permitted Department personnel to consider themselves free, with probable cause to believe that a controlled substance is hidden in a person's rectum or vagina, without first obtaining a warrant and without obtaining the services of a doctor under sanitary conditions, to require the person, without the use of force, to bend forward deeply at the waist so as to expose her rectum and vagina to visual inspection. As the district court properly found, such a custom or practice had in fact developed within the Department and it was actually applied to plaintiff Carolyn Salinas.

The ultimate question is whether a body search limited to these steps is constitutionally permissible when the person searched is in custody following a lawful arrest and when there is probable cause to believe that a controlled substance is hidden on or within the person's body. We think the answer is clear. Such limited measures in these circumstances are valid under the fourth amendment as it is incorporated within the due process clause of the fourteenth amendment. Such a search is reasonable, in the constitutional sense, and performed in a reasonable manner.

695 F.2d at 1084–85 (citations omitted).

for persuasive authority, rather than controlling authority, to clearly establish a legal rule." *Id.* at 428–29 (citing *McClendon*, 305 F.3d at 331–32 (finding no consensus on the "state-created-danger theory" where circuits disagreed over, *inter alia*, the requisite mental state to impose liability on state actors, and where "no court" had applied the theory "to a factual context similar to that of the instant case")). *Ramirez* simply found, "if ever a robust consensus of persuasive authority existed, it exists here." *Id.* at 429. This case is a far cry from *Ramirez*, with fewer cases generally, and with no case applying the theory to this specific factual context. For all these reasons, the Court finds that Usey is entitled to qualified immunity for the search at the BRAVE Cave.

Nevertheless, the Court will give Young leave to amend his *SAC* because the Court finds that doing so may not necessarily be futile. Specifically, Young alleges that he was strip searched at the BRAVE Cave "despite the policy that he would be searched upon being processed into EBRPP." (*SAC* ¶ 79, Doc. 46.) Thus, the *SAC* alludes to the possibility of Young being strip searched a second time by officers after being taken to the jail. Such a search could be unlawful, since officers would have presumably determined Young had no contraband in his body cavities and/or on his person after the first search. That is to say, while there was probable cause to search Young once, there would likely be no probable cause to search him a second time. Ultimately, the Court reserves judgment on this question until the *SAC* is amended and the allegations and arguments on this point are more fully fleshed out. [6]

---

[6] The Court notes that it is also possible that the fact that the existence and use of the BRAVE Cave led to multiple searches, some of which are unconstitutional and unnecessary, may also lead to municipal liability, though the Court reserves judgment on that issue too until a later time.

### D. Excessive Force

#### 1. Parties' Arguments

Usey next contends that the Court should dismiss the excessive force claim against him. (Doc. 71-1 at 12.) First, Young does not allege that Usey used any force against him at all. (*Id.* at 13.) Second, Young was actively resisting, and the officer's strikes were designed to gain compliance; indeed, Young does not allege that he complied with the officer's commands. (*Id.*) The only force used after the initial tasing was the second, and the minimal detail in the *SAC* reflects that Young was resisting. (*Id.* at 13–14.) The video makes things even clearer, and Usey summarizes the contents of the video to highlight this. (*Id.* at 14–15.) Moreover, Usey stopped using force after the 1:33 mark, so he's not responsible for anything after that. (*Id.* at 15.)

> The "force" used by Officer Usey consisted solely of tackling him in order to prevent him from climbing the fence and hitting him five (5) – six (6) times in order to secure him in handcuffs. He waited several seconds after tackling Mr. Young, and order[ed] him to show his hands and roll over, before striking him. Immediately before he threw the first strike, he can be seen briefly (and unsuccessfully) attempting to pull Mr. Young's arm from beneath him. Thus, he did not immediately resort to hitting him, but escalated force as necessary.

(*Id.*) Even the second tasing was not excessive, as Young was resisting the arrest immediately before that moment by "balling up" against the officer's orders. (*Id.* at 15–16.) As in *Tucker v. City of Shreveport*, 998 F.3d at 184, this entire encounter lasted about fifteen seconds, and Usey's use of force was reasonable. (Doc. 71-1 at 16.) Like *Tucker*, Young refused to roll over, concealed his hands, resisted handcuffing, balled up, and disregarded officer orders. (*Id.* at 16–17.) Even if the force was excessive, Usey should be entitled to qualified immunity, "as the chaos evident in the video makes clear that Officer Usey was 'forced to make [a] split-second judgment[]—in

circumstances that [were] tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." (*Id.* at 17 (citations omitted).)

Young responds that "Usey makes several false and misleading statements regarding the contents of Plaintiff's claims. All claims of excessive force occurred <u>after</u> the flight from officers when Plaintiff was already detained and complying with orders." (Doc. 99 at 14.) According to Young, the video shows him complying with orders and Usey kneeling on his back, yet, despite this, Usey punches Young several more times. (*Id.* at 14.) In short, the video does not support Usey's version of events. (*Id.* at 15.)

Usey replies that "[i]t is unclear what, precisely, Plaintiff contends is inaccurate" about Usey's characterization of the video. (Doc. 103. at 6–7.) Young cites cases holding that it is unconstitutional to strike a subdued, compliant suspect, but Usey says these cases are inapplicable because:

> The video makes clear that: (a) when Officer Usey tackled Plaintiff, he was attempting to jump over a fence to escape; (b) when Officer Usey struck Plaintiff, Plaintiff was concealing his hands and failing to obey commands or to submit to arrest; and (c) Officer Usey did not strike Plaintiff once he was finally able to handcuff him. Although Plaintiff was tazed after being handcuffed, that does not save his claims against Officer Usey, as: (a) it was not Officer Usey who tazed him; and (b) the video makes clear that Plaintiff was continuing to resist by balling and kicking his legs at the time the second TASER was deployed.

(*Id.* at 7.)

### 2. *Applicable Law*

#### a. <u>Constitutional Violation</u>

As to the first prong of qualified immunity, "[w]here, as here, the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment, which guarantees citizens

the right 'to be secure in their persons . . . against unreasonable . . . seizures' of the person." *Graham v. Connor*, 490 U.S. 386, 394 (1989). "To prevail on an excessive force claim, a plaintiff must establish: '(1) injury[,] (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable.'" *Freeman v. Gore*, 483 F.3d 404, 416 (5th Cir. 2007) (Dennis, J.) (quoting *Tarver v. City of Edna*, 410 F.3d 745, 751 (5th Cir. 2005)).

"Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (cleaned up). "Excessive force claims are necessarily fact-intensive; whether the force used is 'excessive' or 'unreasonable' depends on 'the facts and circumstances of each particular case.'" *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (quoting *Graham*, 490 U.S. at 396) (citing *Brosseau v. Haugen*, 543 U.S. 194, 201 (2004) (observing that "this area is one in which the result depends very much on the facts of each case")). "Factors to consider include 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Id.* (quoting *Graham*, 490 U.S. at 396). "[T]he question is 'whether the totality of the circumstances justifie[s] a particular sort of . . . seizure.'" *Graham*, 490 U.S. at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)).

"As in other Fourth Amendment contexts . . . , the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397 (citations omitted). "An officer's evil intentions will

26

not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Id.*

Additionally, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396 (citing *Terry v. Ohio*, 392 U.S. 1, 20–22 (1968)). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Id.* (cleaned up). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97.

Nevertheless, "a constitutional violation occurs when an officer tases, strikes, or violently slams an arrestee who is not actively resisting arrest," and Fifth Circuit "case law makes clear that when an arrestee is not actively resisting arrest the degree of force an officer can employ is reduced." *Darden v. City of Fort Worth*, 880 F.3d 722, 731 (5th Cir. 2018) (citations omitted). For example, in *Bush v. Strain*, 513 F.3d 492 (5th Cir. 2008), the appellate court found that "it was objectively unreasonable for an officer to slam an arrestee's face into a vehicle when the arrestee 'was not resisting arrest or attempting to flee.'" *Darden*, 880 F.3d at 731 (quoting *Bush*, 513 F.3d at 502). "Similarly, in [*Newman v. Guedry*, 703 F.3d 757 (5th Cir. 2012)], [the Fifth Circuit] found that it was objectively unreasonable for officers to tase and strike an arrestee with a nightstick without resorting to less violent means when the arrestee's 'behavior did not rise to the level of active resistance.'" *Id.* (internal quotation marks omitted) (quoting *Newman*, 703 F.3d at 763). Thus, "[t]he law was clearly established at the time of the deputies' conduct that, once a suspect has been handcuffed and subdued, and is no longer resisting, an officer's subsequent use of force

is excessive." *Carroll v. Ellington*, 800 F.3d 154, 177 (5th Cir. 2015) (citations omitted). "This includes repeated applications of a Taser after a suspect is arrested, subdued, and no longer resisting arrest." *Id.* (cleaned up).

But, the Fifth Circuit has also "repeatedly refused to hold that '*any* application of force to a compliant arrestee is *per se* unreasonable." *Salazar v. Molina*, 37 F.4th 278, 282 (5th Cir. 2022) (citing, *inter alia*, *Escobar v. Montee*, 895 F.3d 387, 394–95 (5th Cir. 2018) (quotation omitted)). This circuit has explained:

> *Escobar* is instructive. There, an officer allowed his police dog to bite a suspect for a full minute—even after the suspect, "in an attempt to convey his surrender," "dropped his knife and la[id] flat on the ground 'like a parachute man.'" 895 F.3d at 390–91. We still granted the officer qualified immunity. That's because, despite the apparent surrender, other circumstances indicated the suspect might still be a threat. These included: (1) the suspect had committed a felony; (2) he had sought to evade police for 20 minutes; (3) it was nighttime; (4) the suspect had a knife within reach, even though he had dropped it; and (5) the officer had been warned that the suspect was dangerous. *See id.* at 394–95; *see also Crenshaw v. Lister*, 556 F.3d 1283, 1293 (11th Cir. 2009) (per curiam) (determining in similar circumstances that "[e]ven assuming, as we must, that Crenshaw was legitimately attempting to surrender, it was objectively reasonable for Lister to question the sincerity of Crenshaw's attempt to do so" because Crenshaw "up to that point, had shown anything but an intention of surrendering").
>
> As *Escobar* illustrates, a suspect cannot refuse to surrender and instead lead police on a dangerous hot pursuit—and then turn around, appear to surrender, and receive the same Fourth Amendment protection from intermediate force he would have received had he promptly surrendered in the first place. Like *Escobar*, this case involves a fleeing felony suspect who eventually decided to surrender and was then temporarily subjected to intermediate force.

*Id.* at 282–83. "[T]he relevant inquiry is whether—despite the *appearance* of unambiguous surrender—'an officer [would] have reason to doubt the suspect's compliance and still perceive a threat.'" *Id.* at 283 (quoting *Escobar*, 895 F.3d at 395).

28

And while it is true that "'an exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased,' . . . the relevant 'justification for the use of force' is the officer's reasonable perception of a threat of harm." *Id.* (quoting *Lytle v. Bexar Cnty.*, 560 F.3d 404, 413–14 (5th Cir. 2009)). "And this does *not* always require that a suspect be actively resisting, fleeing, or attacking an officer at the precise moment force is used." *Id.* (citing *Lytle*, 560 F.3d at 414) ("noting that it's reasonable to use defensive force where insufficient time has elapsed 'for the officer to perceive new information indicating the threat was past' (quotation omitted)"). "Instead, the relevant inquiry is whether the officer used a justifiable level of force in light of the continuing threat of harm that a reasonable officer could perceive." *Id.*

Thus, in *Salazar*, the Fifth Circuit found that the second *Graham* factor favored the deputy, even though he couldn't see a weapon nearby and even though he had not been warned that the plaintiff was dangerous before the incident. *Id.* at 283–84. The Fifth Circuit noted (1) that cartel activity was near the scene; (2) that there was "the presence of bystanders," and (3) that "the force deployed here was substantially less than that used in *Escobar*—a 10-second tasing before handcuffing rather than 60 seconds of dog biting that continued until the suspect was fully handcuffed." *Id.* at 283–84. *Salazar* also involved a "high-speed chase through a residential neighborhood." *Id.* at 280.

Conversely, in *Joseph v. Bartlett*, 981 F.3d 319 (5th Cir. 2020), the *Graham* factors weighed in favor of the plaintiff because (1) it was undisputed that he had not committed a crime; (2) he presented no immediate threat to officer safety in that the officers knew he was unarmed and had in fact "assumed a fetal, or defensive, position;" and (3) plaintiff did not try to flee or resist arrest, "at least not actively," as he "did not attempt to strike any officer," "made no contact

with any officer," and "was not struggling against the officers at all for substantial portions of the encounter." *Id.* at 333–34 (cleaned up). The officers also "failed to employ measured and ascending action by "immediately resort[ing] to force, without any attempt to de-escalate the volatile situation" or "negotiate," "despite their knowledge that [Joseph] was mentally disturbed." *Id.* at 334.

> Force must be reduced once a suspect has been subdued. [*See, e.g.,* *Cooper v. Brown*, 844 F.3d 517, 524 (5th Cir. 2016); *Carroll*, 800 F.3d at 178.] Notably, "subdued" does not mean "handcuffed." If the suspect lacks any means of evading custody—for example, by being pinned to the ground by multiple police officers—force is not justified. [*See Cooper*, 844 F.3d at 524] (finding excessive force when officer did not release his police dog's bite until after handcuffing the suspect because the suspect was unarmed, in a trash bin, and physically unable to evade custody); *Ramirez v. Martinez*, 716 F.3d 369, 378 (5th Cir. 2013) (finding that tasing was excessive force when a suspect pulled his arm away before the officer had finished handcuffing him).] So even if Joseph failed to comply and struggled against the officers at certain points throughout the encounter, that resistance did not justify force indefinitely.
>
> * * *
>
> Viewing the facts in the light most favorable to Plaintiffs, we agree with the district court's weighing of factors. We hold that, if a jury found those facts to be true, Officers Martin and Costa violated Joseph's right to be free from excessive force during a seizure by failing to employ a measured and ascending response to the threat Joseph posed. Though Joseph was not suspected of committing any crime, was in the fetal position, and was not actively resisting, Officers Martin and Costa inflicted twenty-six blunt-force injuries on Joseph and tased him twice, all while he pleaded for help and reiterated that he was not armed. Officers Martin and Costa are not entitled to summary judgment on the constitutional merits.

*Id.* at 335.

"Yet another consideration bearing upon the reasonableness of an arresting officer's use of force is whether it involved measured and ascending responses to a suspect's noncompliance." *Buehler v. Dear*, 27 F.4th 969, 984 (5th Cir. 2022) (cleaned up). Thus, in *Buehler*, the Court

explained that an officer was entitled to qualified immunity when the plaintiff "relentlessly followed around officers for hours, disobeying their repeated and unambiguous commands that he step back at least arm's length away so as not to block the Officers' field of vision." *Id.* at 984–85.

b.  Qualified Immunity

Again, "[b]ecause the focus is on whether the officer had fair notice that [his] conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Tucker*, 998 F.3d at 173 (quoting *Brosseau*, 543 U.S. at 198). "Clearly established law is determined by controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity." *Id.* (quoting *Clarkston*, 943 F.3d at 993). "For conduct to be objectively unreasonable in light of clearly established law, there need not be a case directly on point, but 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Id.* at 173–74 (quoting *White*, 580 U.S. at 79; *Mullenix,* 577 U.S. at 12).

> Specificity is especially important in the Fourth Amendment context, where the [Supreme] Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. . . . Sufficiently specific precedent involving similar facts can help move a case beyond the otherwise hazy border between excessive and acceptable force and thereby provide an officer notice that a specific use of force is unlawful. Otherwise, qualified immunity protects actions in the hazy border between excessive and acceptable force. Thus, qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. . . . In short, when properly applied, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law. Consequently, qualified immunity is justified unless *no* reasonable officer could have acted as the defendant officers did here, or *every* reasonable officer faced with the same facts would *not* have [acted as the defendant officers did].

*Id.* at 173–75 (cleaned up).

Thus, in *Tucker*, the Fifth Circuit found that officers were entitled to qualified immunity when they struck a plaintiff who "was neither restrained nor subdued when Defendant Officers began to strike him," and when the plaintiff was "pulling his arms from their grasp and failing to put them behind his back," "not giving his hands to the officers for cuffing," and "kicking his legs and not lying still in order to allow himself to be handcuffed," which could "reasonably [be] perceived by Defendant Officers to be a form of physical resistance." *Id.* at 183–84. The Court also noted that "the entirety of the struggle lasted less than one minute. And, importantly, for its duration, the situation was replete with rapid movement, confusion, and the (apparently ignored) repeated directives . . . ." *Id.* at 185. "On these facts, given Tucker's refusal to comply with their verbal directives to put his hands behind his back and quit moving, it would not have been evident to Defendant Officers, based on clearly established law, that they were not entitled to use heightened force in order to gain control of [plaintiff's] hands and place him in handcuffs." *Id.* at 184 (citation omitted). "At a minimum, officers of reasonable competence could disagree as to whether Tucker's rights were violated." *Id.*

Conversely, in *Carroll*, "the issue . . . [was] whether a reasonable jury could conclude that continued force applied *after* a suspect has been restrained and *after* the suspect stops resisting may be clearly excessive and objectively unreasonable." 800 F.3d at 177. Again, the Fifth Circuit explained that, "The law was clearly established at the time of the deputies' conduct that, once a suspect has been handcuffed and subdued, and is no longer resisting, an officer's subsequent use of force is excessive." *Id.* (citing, *inter alia*, *Gomez v. Chandler*, 163 F.3d 921, 922, 924–25 (5th Cir. 1999) (concluding that use of force "while [a prisoner's] hands were handcuffed behind his back" could be considered excessive, precluding summary judgment)). "This includes repeated applications of a Taser after a suspect is arrested, subdued, and 'no longer resisting arrest.'" *Id.*

32

(citing *Anderson v. McCaleb*, 480 F. App'x 768, 773 (5th Cir. 2012) (per curiam); *Autin v. City of Baytown*, 174 F. App'x 183, 185 (5th Cir. 2005)). The appellate court concluded, "Thus, the deputies are not entitled to qualified immunity as a matter of law for injuries [plaintiff] sustained after he was handcuffed and restrained and after he stopped resisting arrest." *Id.*

### 3.  Analysis

Having carefully considered the matter, the Court finds that Usey is entitled to qualified immunity. In the video, Usey pulled Young off the fence as he was attempting to flee and then struck Young in the head five to six times before another unnamed officer tased Young. (Def_C1_995 at 0:45–1:01.) Young can be seen on the video disregarding orders to give Usey his hands in order to be handcuffed prior to being tased. Once the tasing happens, Usey stops punching Young and continues to try to handcuff him. (*Id.* at 1:00–1:31.) At one point, the officers tell Young to unclasp his hands or else they will use force again, including by tasing him. (*Id.* at 1:20–1:31.) Once Young is in handcuffs, Usey no longer uses any force but instead tries to search Young for a weapon. (*Id.* at 1:31–1:41.) Usey instructs Young to roll over, unball, and extend his legs because "we know you've got a gun," and the other officer warns that he will tase Young again. (*Id.* at 1:31–1:46.) Young pleads that he is not balling up, has put his legs out, and has no gun, but the second officer tases Young anyway. (*Id.* at 1:35–1:55.)

Usey's conduct is similar to that of the officers in *Tucker*. While Usey struck Plaintiff, he did so over an extremely short span of time (about 16 seconds) in order to gain compliance over Young, who was not allowing himself to be handcuffed despite instructions to do so. Indeed, Usey is arguably more justified than the officers in *Tucker*, as "Tucker was not attempting to flee," while Young fled from the officers and is first seen trying to hop a fence. *See* 998 F.3d at 181. "At a

minimum, officers of reasonable competence could disagree as to whether Tucker's rights were violated." *Id.* at 184.

That said, the Court finds that the unknown officer who tased Young a second time, after he was already on the ground and after Young was already handcuffed behind his back, is not entitled to qualified immunity. Usey argues that, at that point, Young was still resisting arrest, but the Court must rely on the *SAC* here because the video evidence does not "blatantly contradict" Young's allegations that he was no longer resisting. *See Harmon*, 16 F.4th at 1163; *SAC* ¶¶ 68–70, Doc. 46. Indeed, the video is inconclusive as to whether Young was resisting at that time, and a reasonable jury could conclude that these Officer Defendants violated the "clearly established [law] . . . that, once a suspect has been handcuffed and subdued, and is no longer resisting, an officer's subsequent use of force is excessive." *Carroll*, 800 F.3d at 177. Moreover, though Usey and the Officer Defendants allude to a dangerous, high-speed chase, that pursuit is not captured on any of the bodycams and is wholly absent from the *SAC*, which makes this case distinguishable from *Salazar* and *Escobar*, at least at this point. *See Salazar*, 37 F.4th at 282–83. Indeed, other factors from these cases are absent, such as the fact that Young had "no knife within reach," *id.* at 282 (citing *Escobar*, 895 F.3d at 394–95); that officers had no prior warning that he was dangerous, *id.* (citing *Escobar*, 895 F.3d at 394–95); that there was no cartel activity nearby, *id.* at 283–84; and that there were no potentially dangerous bystanders present, *id.* Rather, as *Joseph* stated, "If the suspect lacks any means of evading custody—for example, by being pinned to the ground by multiple police officers—force is not justified. 981 F.3d at 335. The Court will allow limited discovery on the question of who performed that second tasing and grant Young leave to amend to clarify his allegations.

### E.  Substantive Due Process

Usey next argues that the substantive due process claims are only appropriate if the claim cannot properly be analyzed under another specific constitutional source. (Doc. 71-1 at 18.) Since Young's claims are correctly analyzed under the Fourth Amendment, the substantive due process claim must be dismissed. (*Id.* at 18–19.)

Young responds that there is a viable substantive due process claim. (Doc. 99 at 15.) The basis for that is "an illegal visual cavity search at a BRPD black site." (*Id.* at 15–16.)

In reply, Usey argues that Young failed to address the binding authority that excessive force and unlawful search claims are analyzed under the Fourth Amendment. (Doc. 103 at 7 (citing *Graham*, 490 U.S. at 388).)

The Court finds that Young's substantive due process claim fails, for the reasons given by Usey. "A plaintiff may bring a substantive due process claim under the Fourteenth Amendment only if the claim alleged is not susceptible to proper analysis under a specific constitutional source." *Warren v. Talley*, No. 21-0133, 2022 WL 2359787, at *4 (W.D. La. June 29, 2022) (Hicks, C.J.) (citing *Petta v. Rivera*, 143 F.3d 895, 901 (5th Cir. 1998)); *see also Graham*, 490 U.S. at 395 ("Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims."). Because Young's claims are analyzed under the more specific standards detailed above, he has no substantive due process claim. Usey's motion will be granted on this issue.

### F.  First Amendment Retaliation

#### 1.  *Parties' Arguments*

Usey asserts that the retaliation claim fails as well. (Doc. 71-1 at 19.) Here, there was probable cause to arrest and search Young, so, as a threshold matter, he cannot prevail on this claim. (*Id.* at 19–20.) Even if there was not probable cause, Young does not allege facts to support the allegation that the lawsuit was a motivating factor; knowledge of the lawsuit alone is insufficient to establish causation. (*Id.* at 20.)

In response, Young contends that the *arrest* was not retaliatory; rather, the unlawful search was. (Doc. 99 at 16.) Here, "there was no probable cause to conduct a visual cavity search of Plaintiff, especially not at a black site without documentation." (*Id.* at 17.) Young pleads more than mere knowledge, as:

> immediately after recognizing who Plaintiff [was] and that he had filed a suit, the Officer-Defendants laugh[ed] and then shut off their camera audio. Plaintiff was transported to the BRAVE Cave and illegally searched shortly thereafter. Defendants' reactions to learning of the lawsuit and the timeline of these events is evidence of causation.

(*Id.* at 17.)

In reply, Usey argues that the First Amendment retaliation claim should be dismissed because:

> (a) [Young] has not alleged that Officer Usey had any involvement in the search; (b) there was probable cause for the search . . . ; and (c) he has not made any allegations that would support a finding of retaliatory intent, but only alleges that one (1) of the officers (although he does not state which officer or allege that it was Officer Usey) had knowledge of this lawsuit at the time of the August 4, 2023 arrest, and knowledge of protected activity is an entirely separate issue from causation or motive. [*See, e.g.*, *Robinson v. Jackson State Univ.*, 714 F. App'x 354, 362 (5th Cir. 2017); *Barrow v. New Orleans S.S. Ass'n*, 10 F.3d 292, 298 (5th Cir. 1994).]

(Doc. 103 at 8 & n.9.)

### 2. *Law and Analysis*

Having carefully considered the matter, the Court will grant Usey's motion to dismiss the retaliation claim. However, for the same reasons given above, the Court will grant leave to amend to explore whether other Officer Defendants strip searched Young a second time without probable cause in retaliation for Young filing a lawsuit.

As this Court explained in *Imani v. City of Baton Rouge*, 614 F. Supp. 3d 306 (M.D. La. 2022):

> "'[A]s a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions' for engaging in protected speech." *Nieves v. Bartlett*, [587 U.S. 391], 139 S. Ct. 1715, 1722 [ ] (2019) (quoting *Hartman v. Moore*, 547 U.S. 250, 256 [ ] (2006)). As the Fifth Circuit has explained, "[t]o prevail on a First Amendment retaliation claim, Plaintiff must demonstrate that (1) he was engaged in constitutionally protected activity, (2) the officers' action caused him to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the officers' adverse actions were substantially motivated against Plaintiff's exercise of constitutionally protected conduct." *Alexander v. City of Round Rock*, 854 F.3d 298, 308 (5th Cir. 2017) (citation omitted).
>
> "But if an officer has probable cause to seize that individual, 'the objectives of law enforcement take primacy over the citizen's right to avoid retaliation.'" *Davidson v. City of Stafford, Texas*, 848 F.3d 384, 391 (5th Cir. 2017) (citing *Allen v. Cisneros*, 815 F.3d 239, 245 (5th Cir. 2016) (quoting *Keenan v. Tejeda*, 290 F.3d 252, 261–62 (5th Cir. 2002))). . . . In sum, "[a]bsent [ ] a showing [of no probable cause], a retaliatory arrest claim fails." *Nieves*[, 139 S. Ct. at 1725]. "But if the plaintiff establishes the absence of probable cause, then . . . the plaintiff must show that the retaliation was a substantial or motivating factor behind the arrest, and, if that showing is made, the defendant can prevail only by showing that the arrest would have been initiated without respect to retaliation." *Id.* (cleaned up).

*Id.* at 356–57.

"Filing a lawsuit is a type of speech" protected by the First Amendment, *Marceaux v. Lafayette City-Par. Consol. Gov't*, 921 F. Supp. 2d 605, 636 (W.D. La. 2013) (citing *Rathjen v. Litchfield*, 878 F.2d 836, 842 (5th Cir. 1989)), and that is not seriously disputed. Rather, Usey disputes the second and third requirements.

As explained above, the Court found that there was arguably probable cause to perform the first search by Officer Defendants. Thus, they would be entitled to qualified immunity for this retaliation claim as well. However, as also explained above, if Officer Defendants strip searched Young a second time, after already determining that he had no contraband in any body cavity, then those officers likely lacked probable cause. Thus, the Court will grant Young leave to amend the *SAC* to cure this deficiency and flesh out the allegations and arguments.

If Young can establish the absence of probable cause,[7] then the Court agrees with Young that he has stated a viable claim for retaliation. The video shows that Young informed the Officer Defendants of his name and told them he had filed a lawsuit, and then one of the officer says, "Oh, I know who you are." (Dec_C1_995 at 18:15–18:50.) He then laughs and says again, "I know who he is." (*Id.*) At that point, the audio stream of the video is cut off and the officers continue to talk. (*Id.*) Later, the officers are talking to the paramedic, who offers to take Young to the hospital, and

---

[7] The Supreme Court has recognized that there is an exception to the probable cause requirement. Specifically:

> "[A]lthough probable cause should generally defeat a retaliatory arrest claim, a narrow qualification is warranted for circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so." [*Nieves*, 139 S. Ct.] at 1727. . . . Thus, "the no-probable-cause requirement should not apply when a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Id.* at 1727 (citation omitted). "After making the required showing, the plaintiff's claim may proceed in the same manner as claims where the plaintiff has met the threshold showing of the absence of probable cause." *Id.* (citation omitted).

*Imani*, 614 F. Supp. 3d at 357. Young has not argued that this exception is applicable, (*see* Doc. 99 at 17), so the Court passes on that question.

one of the Officer Defendants says, "We're going to take him." (*Id.* at 29:10–29:25.) They later tell the paramedic and Young that they will take Young to the hospital to be checked out. (*Id.* at 32:15–32:54.) A reasonable juror could conclude from these facts that the Officer Defendants not only knew about Young's protected activity but that any later decision to strip search him a second time was premeditated and "substantially motivated" by Young's filing suit.

Accordingly, Usey's motion is granted. This claim will be dismissed without prejudice, though leave to amend will be granted.

### G. Section 1983 Conspiracy

#### 1. Parties' Arguments

According to Usey, the conspiracy claim is conclusory. (Doc. 71-1 at 20–21.) In any event, there is no underlying constitutional violation, so the claim fails for that additional reason. (*Id.* at 21.)

Young responds that the same allegations about retaliation support the conspiracy claim; "This is the crux of the conspiracy: Officer-Defendants working together, after turning off their body-worn cameras, to deprive Plaintiff of his civil rights." (Doc. 99 at 17–18.)

Usey replies that the conspiracy claim fails because, in support of the claim, Young alleges only that the officers knew about the prior lawsuit and nothing else. (Doc. 103 at 8.)

#### 2. Applicable Law

"In order to prevail on a section 1983 conspiracy claim, a plaintiff must establish (1) the existence of a conspiracy involving state action and (2) a deprivation of civil rights in furtherance of the conspiracy by a party to the conspiracy." *Pfannstiel v. City of Marion*, 918 F.2d 1178, 1187 (5th Cir. 1990), *overruled in part on other grounds by*, *Duckett v. City of Cedar Park*, 950 F.2d 272 (5th Cir. 1992); *see also Jabary v. City of Allen*, 547 F. App'x 600, 610 (5th Cir. 2013) ("To

prove a conspiracy under § 1983, a plaintiff must allege facts that indicate (1) there was an agreement among individuals to commit a deprivation, and (2) that an actual deprivation occurred." (citing *Cinel v. Connick*, 15 F.3d 1338, 1343 (5th Cir.1994)).

Regarding the first element: "To establish a cause of action based on conspiracy a plaintiff must show that the defendants agreed to commit an illegal act." *Arsenaux v. Roberts*, 726 F.2d 1022, 1024 (5th Cir. 1982) (Rubin, J.). "Mere conclusory allegations of conspiracy cannot, absent reference to material facts, survive a motion to dismiss." *Id.* (citing *Slotnick v. Staviskey*, 560 F.2d 31, 33 (1st Cir. 1977)). "[M]ore than a blanket of accusation is necessary to support a § 1983 claim." *Id.* (citations omitted). Plaintiffs must make "specific allegation[s] of facts tending to show a prior agreement has been made." *Id.* at 1023–24.

As to the second element, "[a] conspiracy may be charged under section 1983 as the legal mechanism through which to impose liability on all of the defendants without regard to who committed the particular act, but 'a conspiracy claim is not actionable without an actual violation of section 1983.'" *Hale v. Townley*, 45 F.3d 914, 920 (5th Cir. 1995) (quoting *Pfannstiel*, 918 F.2d at 1187). For example, "in a case alleging both Fourth Amendment violations and a § 1983 conspiracy, the proper order of review is *first* whether Plaintiffs have alleged a constitutional violation that is objectively unreasonable in light of clearly established Fourth Amendment law, and *only if that is the case* should the court then consider whether Plaintiffs have alleged a conspiracy." *Morrow v. Washington*, 672 F. App'x 351, 355 (5th Cir. 2016) (emphasis in original).

### 3. Analysis

The Court will grant Usey's motion for reasons similar to those given for the retaliation claim. While a reasonable jury could easily infer an agreement—based on (1) one Officer Defendant's laughter upon recognizing Young, (2) the cutting off of the audio feed, (3) the

continued discussion off the record, and (4) the Officer Defendants' insistence on bringing Young to the hospital themselves, (Dec_C1_995 at 18:15–18:50, 29:10–29:25)—as explained above, Young has failed to state a viable claim for an unlawful search. While Young may cure that deficiency after an amendment, at this time, Usey's motion must be granted, and the claim will be dismissed without prejudice for lack of an underlying constitutional violation.

### H. Failure to Intervene

#### 1. Parties' Arguments

Usey next argues that the failure to intervene claim must be dismissed. (Doc. 71-1 at 21.) Young fails to allege that Usey observed his fellow officers violating constitutional rights, and, indeed, all officers' conduct was lawful. (*Id.*) The only conceivable claim is that Usey failed to prevent one officer from tasing Young, but (a) this tasing was lawful, and (b) the tasing took place in a matter of seconds while Usey was struggling with Young and trying to handcuff him, so, at the very least, Usey is entitled to qualified immunity. (*Id.* at 21–22.)

Young responds that the failure to intervene claim survives. (Doc. 99 at 18.) "Here, Defendant Usey was aware that Plaintiff was going to be taken to the BRAVE Cave and subject[ed] to an illegal search, but chose not to intervene." (*Id.*)

Usey replies that the failure to intervene claim fails because the *SAC* nowhere alleges that Usey knew that Young would be taken to the BRAVE Cave yet failed to protect him. (Doc. 103 at 8–9.)

#### 2. Law and Analysis

"An officer is liable for failure to intervene when that officer: (1) knew a fellow officer was violating an individual's constitutional rights, (2) was present at the scene of the constitutional violation, (3) had a reasonable opportunity to prevent the harm but nevertheless, (4) chose not to

act." *Joseph*, 981 F.3d at 343 (citing *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013)). "Bystander liability requires more than mere presence in the vicinity of the violation; 'we also consider whether an officer "acquiesced in" the alleged constitutional violation.'" *Id.* (quoting *Whitley*, 726 F.3d at 647 (quoting *Hale*, 45 F.3d at 919)). Qualified immunity requires a separate analysis for each officer. *See id.*

Further, "Plaintiffs have the burden to demonstrate that the law was 'clearly established'— that, as of . . . the date of their encounter with [plaintiff], any reasonable officer would have known that the Constitution required them to intervene." *Id.* at 345 (quoting *Saucier*, 533 U.S. at 199). "And [the Court] cannot deny qualified immunity without identifying a case in which an officer acting under similar circumstances was held to have violated the Fourth Amendment, and without explaining why the case clearly proscribed the conduct of that individual officer." *Id.*

Having carefully considered the matter, the Court will grant Usey's motion. As explained above, Usey and the other officers were entitled to qualified immunity for their search of Young at the BRAVE Cave. For similar reasons, Young has failed to provide a case establishing that every reasonable officer would know, beyond debate, that they had a duty to intervene to prevent that search. And while the Court will grant Young leave to amend to cure the deficiencies of the *SAC*, the Court also notes that, if Young attempts to allege that Usey and the other Officer Defendants failed to intervene to prevent a second search (if it occurred), then Young must also allege that Usey was present at the scene of this second search and had a reasonable opportunity to prevent the harm.

## I. State Law Claims

### 1. Parties' Arguments

Usey lastly argues that the state law claims must be dismissed. (Doc. 71-1 at 22.) Most are subject to the same Fourth Amendment analysis given above. (*Id.*) Further, there is no basis for a negligence claim, and Young's IIED claim fails because (a) Usey did not intend to inflict harm and (b) there was probable cause for the arrest. (*Id.* at 23–24.)

Young opposes dismissal of his state law claims. (Doc. 99 at 18.) As to the negligence claim, Young argues that Usey breached his duty twice: "when he committed excessive force and when he facilitated an unlawful search, both instances within the scope of liability and caused actual injuries to Plaintiff, as described above." (*Id.* at 19.) The IIED claim is evident from the "unlawful search, conducted at a black site without documentation." (*Id.* at 19–20.)

Usey replies that the state law claims fail because (a) Young alleges intentional conduct, not negligence, and (b) the search was justified, so there can be no IIED claim. (Doc. 103 at 9.)

### 2. Law and Analysis

The Court need not provide a robust analysis of the state law claims; rather, they largely rise and fall to the same extent as their corresponding federal claims. *See Imani*, 614 F. Supp. 3d at 381 (denying motion for summary judgment on plaintiffs' assault and battery claims "largely for the same reasons the federal excessive force claims survive"); *id.* at 376–77 ("[A]bsent more precise guidance from the Louisiana Supreme Court, the Fourth Amendment standards control the analysis of alleged infringements on the constitutional right to privacy." (cleaned up)); *Snow Ingredients, Inc. v. SnoWizard, Inc.*, 833 F.3d 512, 526 (5th Cir. 2016) (explaining that, to establish a conspiracy claim under La. Civ. Code art. 2324, "the plaintiff is required to establish a meeting of the minds or collusion between the parties for the purpose of committing wrongdoing" (cleaned

up)). Thus, the Court resolves Young's corresponding state law claims (other than negligence and IIED) the same way as it did the federal claims.

The Court will deny the motion as to the negligence claim. Though Usey is entitled to qualified immunity for the excessive force claim, a reasonable jury could conclude that he failed to act as a reasonably prudent officer in his conduct which led to the second tasing (specifically, in being as aggressive as he was after Young was already handcuffed and subdued). (*See* Def_C1_995.mp3 at 1:30–1:55.) Further, while Young has failed to plead negligence in connection with the search, the Court will give leave to amend on this point, as discussed above.

Additionally, the Court finds that Young has not adequately alleged an IIED claim. However, such a claim may be viable if Young can connect the dots and show that Usey and the other Officer Defendants subjected Young to a second strip search without probable cause (which would constitute outrageous and extreme conduct, *see Imani*, 614 F. Supp. 3d at 377). Likewise, a reasonable jury could conclude that the Officer Defendants' intent to cause severe distress can be inferred from their laughter and their silencing the bodycam audio, as explained above.

## IV.   DISCUSSION: OTHER MOTIONS (DOCS. 67, 74, 76)

### A.  Parties' Arguments

#### 1.   *Thomas's Original Brief (Doc. 67-1)*

Thomas argues that the *SAC* contains no factual allegations about him. (Doc. 67-1 at 5.) According to Thomas, the sole reference to him is paragraph 20, where he is named as a Defendant. (*Id.*) But the *SAC* is silent as to why. (*Id.*) All the allegations of the *SAC* refer to all defendants "in a collective generic form," but such conclusory allegations are insufficient. (*Id.*)

### 2. *Carboni's Original Brief (Doc. 74-1)*

Carboni first notes that he was not involved in the 2018 incident, and Carboni then seeks dismissal for claims arising from the 2023 incident. (Doc. 74-1 at 7.) Carboni emphasizes that the *SAC* omits the fact that Young led the officers on a high-speed chase through a residential neighborhood before crashing his motorcycle into a fence. (*Id.*) Young then fled on foot and ignored commands from the police to stop fleeing, including by trying to jump a fence. (*Id.*) Carboni appeared on video at the 20:14:35 mark of the video, by which time Young was already detained and handcuffed. (*Id.*) Carboni touched Plaintiff only twice: "once to carry him to another officer's police unit and then to assist him to his feet and into the unit." (*Id.*)

Thus, the *SAC* paints an entirely different portrait of what happened than the video. (*Id.* at 8.) After Young was apprehended, he did not comply with the officers' commands but rather kept his hands hidden under his body so that the officers could not determine if Young was holding a weapon. (*Id.*) Further, Young balled up despite the officers' commands to the contrary, so they could not check if he had a weapon. (*Id.*) "Young's compliance [with] all of the officers' commands had to be forced; he did not willingly comply with a single instruction. His refusal to comply necessitated the officers' use of force which was certainly reasonable under the circumstances." (*Id.*) Young continued not to comply after he was handcuffed, as he refused to stand (requiring him to be carried) and refused to be placed in the police unit (requiring him to be put on the ground before finally allowing himself to be put in the car). (*Id.*) At one point, Young even flopped out of the unit. (*Id.*)

In any event, the allegations against Carboni are entirely conclusory. (*Id.* at 9.) Young has the burden of overcoming qualified immunity, but he "fails to mention any specific behavior by Carboni . . . ." (*Id.* at 10.) At the very least, Carboni is entitled to a more definite statement of the

claims against him. (*Id.*) Ultimately, the *SAC* is a shotgun pleading, as only two officers apprehended and tased plaintiff; yet he asserts the same general allegations against all eight defendants. (*Id.* at 10–11.)

### 3. *Kennedy's Original Brief (Doc. 76-2)*

Kennedy argues that the *SAC* fails to state a viable claim against him "because it utterly fails to articulate any specific action he allegedly took before, during, or after the 2018 and 2023 arrests. Where a Complaint fails to plead specific allegations as to an individual defendant's alleged activities, claims against that defendant are properly dismissed." (Doc. 76-2 at 14 (citations omitted).) Thus, the claims against Kennedy should be dismissed. (*Id.* at 15.)

Additionally, Kennedy is entitled to qualified immunity. (*Id.*) "Young has not alleged when, where or how Kennedy violated his rights and accordingly has also failed to alleged facts to show that Kennedy's actions were objectively unreasonable in light of clearly established constitutional law." (*Id.* at 16.) Young has failed to point to specific case law showing the right was clearly established. (*Id.*) Further, "many of his claims lack individualized allegations against specific Defendants. It is axiomatic that the acts of individuals must be considered individually in a . . . § 1983 action." (*Id.* at 17.) Without showing what specific role Kennedy played, Young cannot defeat qualified immunity. (*Id.*)

Additionally, the punitive damages claim against Kennedy must be dismissed. (*Id.* at 17–18.) Young fails to show that Kennedy acted with evil intent or reckless or callous indifference to Young's rights. (*Id.*)

### 4. *Young's Opposition to Thomas's Motion (Doc. 94)*

Young's opposition to Thomas's brief largely echoes his opposition to Carboni's and Kennedy's, with a little less detail. (*Compare Doc.* 94, *with* Docs. 97, 98.) Thus, the Court will

focus on Young's opposition to Thomas's brief, while recognizing that these arguments apply with equal force to Carboni's and Kennedy's.

Young details in the factual background section how the identities of the Officer Defendants were not originally known to him. (Doc. 94 at 4–5.) Then, Young propounded discovery requests to the City for the identities of the officers involved in the arrests, and the City responded with arrest reports. (*Id.* at 5–6.) Still, despite the bodycam footage and bystander videos, Young "has not been able to identify which officers are which in the videos." (*Id.* at 3.)

Turning to the argument, Young acknowledges that he cannot plead which defendant committed what act, but (1) the *SAC* alleges that "*all* Officer-Defendants who were present are at the very least liable as parties to the conspiracy and for failure to intervene"; and (2) the videos show the Officer Defendants committing the violations. (*Id.* at 7–8.)

> [I]t is disingenuous for these defendants to claim that the operative pleading does not give the defendant fair notice of what the plaintiffs' claims are and the grounds upon which it rests, particularly with respect to which officers were involved, when (1) Plaintiffs expressly list many officer names, and (2) these defendants would certainly have access to that information.

(*Id.* (citation omitted).)

Young argues that the Court should not grant the motion but should rather allow leave to amend as the proper remedy. (*Id.* at 8.) Young identified Thomas as an Officer Defendant from his Facebook photo, and "Limited discovery is necessary to confirm that the Facebook page belongs to the . . . Thomas . . . that is a named defendant in this matter and that the individual in the body-camera is the named defendant." (*Id.* at 9.) Young prays that the motion be "denied or, alternatively, Plaintiff should be afforded an opportunity to amend the complaint after limited discovery to identify the officers." (*Id.* at 9.)

### 5. *Thomas's Reply (Doc. 104)*

Thomas first emphasizes that there are two new factual allegations against him in Young's opposition: (1) that Thomas was present at the August 24, 2023, incident, and (2) that he took evidence in the case. (Doc. 104 at 1–2.) But complaints cannot be amended through oppositions, and, in any event, Young still fails to allege any facts to support the suggestion that Thomas was involved in a conspiracy or that he failed to intervene. (*Id.* at 2.)

Ultimately, Young's *SAC* "provides no specifics at all as to what Officer Thomas purportedly did wrong in this case." (*Id.*) "[F]or . . . Thomas to have a fair opportunity to meet the allegations against him with a response, he needs to know what he is accused of doing and why Plaintiff asserts that his actions were wrong – i.e. the basis of his alleged liability under the specific claims" in the *SAC*. (*Id.* at 3.) Young's allegations remain conclusory, so they must be dismissed. (*Id.*) Alternatively, the claims against Thomas arising from the 2018 arrest should be dismissed, as Young "has made no discernable showing that Officer Thomas was involved with that incident whatsoever." (*Id.* at 4.)

### 6. *Kennedy's Reply (Doc. 105)*

Kennedy begins by emphasizing that the only specific factual support in Young's opposition is (1) that the City states that Kennedy was involved in the 2023 arrest, and (2) that the arrest report shows he was involved in this arrest too. (Doc. 105 at 1.) Thus, the *SAC* pleads no facts against Kennedy for the 2018 arrest, and all claims against Kennedy arising from this encounter must be dismissed. (*Id.* at 1–2.) Further, the only link between Kennedy and the 2023 incident were the above discovery responses, but these contain no admission. (*Id.*) Moreover, Young claims to have no personal knowledge of who was involved, but he was an eyewitness to

48

the events, and eyewitnesses to every event should at least be able to give general descriptions of who was involved. (*Id.*)

In any event, Kennedy is still entitled to qualified immunity. (*Id.* at 3.) Here, Kennedy highlights the facts purportedly evident from the video, including Young's high-speed chase, motorcycle crash, failure to comply, flight from officers, and narcotics on his person. (*Id.*) Thus, even if Kennedy was involved in the 2023 incident, there was probable cause to arrest Young and a good faith belief that he had committed multiple felonies. (*Id.* at 3–4.)

### B.  Law and Analysis

In sum, the Court will grant the motions to much the same extent as the Court granted Usey's, with a few exceptions. That is to say, the Court finds that Young failed to state a viable claim against Officer Defendants for the following claims: (1) the first strip search at the BRAVE Cave; (2) Young's substantive due process claim; (3) retaliation in violation of the First Amendment for the first search; (4) conspiracy; (5) failure to intervene; and (6) Young's state law claims. Further, the Court will give leave to amend to provide Young with an opportunity to flesh out claims for a second unlawful strip search, which directly impacts Young's retaliation, conspiracy, failure to intervene, and state law claims.

Unlike with Usey, the Court will allow limited discovery on the sole issue of which Officer Defendant tased Young. As explained above, the Court finds the second tasing excessive and that this officer is not entitled to qualified immunity. Further, Plaintiff has stated viable claims against that officer for assault, battery, and negligence.

### V.  CONCLUSION

Accordingly,

**IT IS ORDERED** that the following motions are **GRANTED IN PART** and **DENIED IN PART**:

(1) the *Motion to Dismiss Pursuant to Rule 12(b)(6)* (Doc. 71) by Defendant Brett Usey;

(2) the *Motion to Dismiss* (Doc. 67) by Defendant James Thomas, Jr.;

(3) the *Motion to Dismiss Pursuant to FRCP Rule 12(b)(6) or, Alternatively, Motion for More Definite Statement Pursuant to FRCP Rule 12(E)* (Doc. 74) by Defendant Joseph Carboni; and

(4) the *Motion to Dismiss Pursuant to Fed. R. Civ. P. Rule 12(b)(6)* (Doc. 76) by Defendant David Kennedy.

**IT IS FURTHER ORDERED** that Usey's motion is **GRANTED** in that all claims by Plaintiff Steven W. Young against Usey are **DISMISSED WITHOUT PREJUDICE**, except Young's claim for negligence. In that respect, the motion is **DENIED**. Further, Usey seeks dismissal of two claims not made against him: (1) Young's theft of property claim and (2) official capacity claims. In those respects, the motion is **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that Thomas's, Carboni's, and Kennedy's motions are **GRANTED** in that all claims by Young against these Officer Defendants are **DISMISSED WITHOUT PREJUDICE**, except Young's claim for excessive force, assault, battery, and negligence. The Court will allow Young limited discovery over a period of sixty (60) days on the narrow issue of which defendant was responsible for the second tasing.

[*continued on next page*]

50

**IT IS FURTHER ORDERED** that Young shall have twenty-eight (28) days from the end of the discovery period in which to amend the *SAC*, clarify his allegations, and cure the deficiencies detailed in this opinion. Failure to do so will result in the dismissal of these claims with prejudice.

Signed in Baton Rouge, Louisiana, on <u>February 25, 2026</u>.

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**